**Norman E. DeVOE, Plaintiff,**

**v.**

**MEDI–DYN, INC., Defendant.**

**Civ. A. No. 90–1483–B.**

United States District Court,
D. Kansas.

Jan. 15, 1992.

Daniel T. Brooks, Wichita, Kan., for plaintiff.

Susan P. Selvidge, Fleeson, Gooing, Coulson & Kitch, Wichita, Kan., for defendant.

## MEMORANDUM AND ORDER

BELOT, District Judge.

This matter is before the Court on the motion of defendant ("Medi–Dyn") for summary judgment (Doc. 12).[1] Plaintiff has filed this action alleging race discrimination in violation of 42 U.S.C. §§ 2000e *et seq.* ("Title VII") and 42 U.S.C. § 1981. Plaintiff also alleges pendent claims based upon state law for breach of employment agreement and wrongful discharge. In response to defendant's present motion, plaintiff informs the Court that he agrees to dismissal of his claims under § 1981 and his state claim sounding in wrongful discharge. (Plaintiff's Memo in Opposition, Doc. 28, at 1). The Court will therefore grant defendant's motion as to this conceded claim.

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). "Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who 'fails to make a showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Aldrich Enters., Inc. v. United States,* 938 F.2d 1134, 1138 (10th Cir.1991) (quoting *Celotex,* 477 U.S. at 322, 106 S.Ct. at 2552). Summary judgment is inappropriate, however, if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.,* 944 F.2d 677, 684 (10th Cir.1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53. This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Id.* (emphasis in original). Once the moving party properly supports its motion, the nonmoving party "may not rest upon mere allegation or denials of his pleading, but must set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at

---

**1.** The Court finds that oral argument would serve no useful purpose in this case and there-

fore denies defendant's motion for oral argument. D.Kan.Rule 206(d).

256, 106 S.Ct. at 2514; *Devery Implement Co. v. J.I. Case Co.*, 944 F.2d 724, 726 (10th Cir.1991). The court reviews the evidence in a light most favorable to the non-moving party, *e.g., Washington v. Board of Public Utilities,* 939 F.2d 901, 903 (10th Cir.1991), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513–14.

## I. *Pertinent Facts*

The following facts are either admitted, not specifically controverted, or controverted without reference to the particular portions of the record upon which plaintiff relies. The Court deems all such facts to be admitted. *See* D.Kan.Rule 206(c).

1. Plaintiff is a black man who entered into employment with defendant on June 1, 1988. Defendant has a contract to supervise the Housekeeping Department at St. Francis Regional Medical Center in Wichita. Prior to being hired by defendant, plaintiff was employed by the St. Francis Regional Medical Center as a Trash Technician. His title during his employment with defendant was "Supervisor Trainee."

2. Plaintiff was interviewed for the position with defendant by Mr. Lynn Dunning, Medi–Dyn's Vice President/Operations. Mr. Dunning hired plaintiff as a "non-operational" supervisor in training at an agreed training rate of $16,000 per year. Plaintiff had minimal qualifications with no management experience. Following hire on June 1, 1988, plaintiff began training at the agreed upon salary.

3. During the hiring process, plaintiff filled out and signed an application for employment that stated:

I HEREBY ATTEST TO THE TRUTH OF ALL STATEMENTS MADE BY ME ON THIS APPLICATION AND UNDERSTAND THAT ANY FALSE INFORMATION OR OMMISSION [sic] OF FACTS ASKED FOR MAY RESULT IN THE REFUSAL OF MY APPLICATION, BE GROUNDS FOR TERMINATION IN THE EVENT THAT I AM HIRED AND ENTITLE MEDI–DYN INC. SERVICES ANY OTHER REMEDY WHATSOEVER AT LAW OR EQUITY TO WHICH IT MAY BE ENTITLED.

(Defendant's Statement of Facts, ¶ 9, Doc. 13 at 5).

4. At the time he was hired, plaintiff signed a written Employment Agreement, which plaintiff admitted he read. The Agreement does not specify a term of employment, and contains the following provision:

I realize that the nature of the corporation's business is such that it must, from time to time, relocate its management and supervisory employees to different geographic work locations in order to meet the Corporation's and clients' needs. I further understand that it is a condition of my employment that I be willing to relocate as needed to meet the Corporation's needs and that the Corporation would not employ me and spend time and money training me if I was not willing to agree to this requirement. Failure by me to accept relocation at the Corporation's request shall be deemed willful misconduct by me and a breach of this employment agreement.

(Defendant's Statement of Facts, ¶ 10, Doc. 13 at 6).

5. On or about August 29, 1988, plaintiff finished training and began working as a temporary supervisor awaiting assignment to a regular supervisor position. Plaintiff also received a raise to $17,000.

6. Plaintiff understood that his supervisory position at St. Francis was "not permanent" but "temporary," and stated in his deposition that "St. Francis is basically kind of used as a training ground for Medi–Dyn supervisors, for most of them." (Defendant's Statement of Facts, ¶ 13, Doc. 13 at 7).

7. On or about October 1, 1988, plaintiff was approached by Mr. Dunning concerning a job transfer to St. Louis, Missouri. Plaintiff said he was ready as far as his work skills were concerned, but that he needed to clear up some legal matters first. These legal matters involved gaining legal custody of his son in order to take him out

of the State of Kansas, and also some credit problems.

8. Plaintiff wanted to fly to St. Louis and look the job over, but Mr. Dunning wanted him to drive there immediately and start work. Plaintiff said that Mr. Dunning eventually told him that he must accept the transfer to St. Louis or he would not have a job at all.

9. When Mr. Dunning insisted that plaintiff accept the transfer to St. Louis and drive there to begin work immediately, plaintiff said that his car was not reliable. Mr. Dunning advanced plaintiff $200 for new tires, tune up, and an oil change.

10. Plaintiff accepted the transfer and, after negotiating four or five days' delay, drove to St. Louis on or about October 7, 1988.

11. Plaintiff began working in St. Louis as a second shift supervisor. Plaintiff stayed at a motel at this time and spent evenings and weekends looking for an apartment.

12. On or about October 15, 1988, plaintiff returned to Wichita for his son and a woman friend with two daughters whom he planned to live with. Plaintiff rented a U-Haul to move furnishings, and returned with them to the motel where he had been staying in St. Louis.

13. Defendant paid the moving expenses submitted by plaintiff for the three weeks that plaintiff was in St. Louis. Defendant also made several advances to plaintiff to help him rent an apartment in St. Louis, as well as to help him pay rent in Wichita.

14. Throughout the three final weeks of October, plaintiff looked for an apartment but was unable to find one due to his poor credit rating.

15. On or about October 27, 1988, Mr. Dunning declined to give any additional cash advances, saying that plaintiff should

have found an apartment already. (Plaintiff's Memo in Opposition, Doc. 28, at 8).

16. Because plaintiff was unable to find an apartment, plaintiff decided to move his family back to Wichita. On or about Sunday, October 30, 1988, plaintiff took his car and the U-Haul with his family back to Wichita.

17. Plaintiff was to report for work on Monday, October 31, 1988 at 2:30 p.m. and would have had to leave Wichita by 6:30 a.m. in order to make the 8-hour drive back to St. Louis in time for his shift.

18. During the drive from Wichita to St. Louis on Sunday night, plaintiff's car broke down near Emporia. Plaintiff left the disabled car on the road and completed the trip to Wichita with the U-Haul truck. Plaintiff unloaded his furniture Sunday night.

19. In his deposition, plaintiff admitted that after the car broke down, he did not attempt to call anyone at his place of employment in St. Louis in order to inform them of his car problems.[2] (DeVoe Depo. at 153).

20. The following Monday morning, plaintiff went to St. Francis Hospital in Wichita to withdraw some money from his bank account at the Credit Union there.

21. Later that morning, plaintiff returned to the abandoned car with a friend. The two determined that the car needed a new water pump. At this time, plaintiff placed a call from an Emporia pay phone to the hospital in St. Louis. The hospital operator was unable to locate plaintiff's supervisor in St. Louis, Chriss Tricozzi, and plaintiff did not leave a message. (DeVoe Depo. at 156).

22. Plaintiff and his friend returned to Wichita for a water pump. They then returned to Emporia and made the repair, which took several hours. After completing the repair, plaintiff thinks he tried to call the hospital in St. Louis again, but he

---

**2.** In response to the present motion, plaintiff has filed an affidavit stating that he "called the hospital several times." Doc. 29, ¶ 5. Because the affidavit does not specify when plaintiff called the hospital, the Court does not construe this as an attempt to contradict plaintiff's deposition testimony that he did not call his employer at the time his car broke down. *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir.1986) (court may disregard affidavit contrary to prior sworn testimony if this is an attempt to create sham fact issue).

did not reach Mr. Tricozzi. Plaintiff specifically admits that he did not leave any message for Mr. Tricozzi at any time on Monday, October 31 for his failure to report to work that day.

23. When plaintiff did not report to work for his 2:30 p.m. shift on Monday, Mr. Tricozzi tried to call plaintiff at the motel where he had been staying and was told that plaintiff had checked out and left with his family and the U–Haul truck. Plaintiff's failure to report to work and to explain his absence was reported to Mr. Dunning and Al Tambollio, Medi–Dyn's Area Manager over the St. Louis area. Mr. Dunning was also informed that plaintiff had been seen at St. Francis Hospital in Wichita on Monday morning.[3]

24. Plaintiff was still in Wichita on the morning of Tuesday, November 1, 1988 at a time when it would have been impossible for him to drive to St. Louis in time for his 2:30 shift that day. (DeVoe Depo. at 167).

25. Plaintiff did not reach Mr. Tricozzi by telephone until either the night of October 31 or the morning of November 1. Mr. Tricozzi told plaintiff that he should talk to Mr. Dunning before returning to St. Louis. (DeVoe Depo. at 170).

26. Mr. Dunning avers that the information communicated to him persuaded him to fire plaintiff for "job abandonment." Mr. Dunning states:

> Since plaintiff had been observed doing business at St. Francis Hospital in Wichita on the morning of the 31st, there did not seem to be any reasonable excuse for his failure to be at work or to call with any good reason for his absence. Al Tambollio and I concluded from all the circumstances that plaintiff had abandoned his job. No Medi–Dyn Supervisor had ever failed to report to supervise a shift and also failed to timely call with an explanation for the absence. This dereliction of duty by plaintiff deprived his supervisor of a chance to arrange for a substitute Supervisor for the 2:30 p.m.

shift. As of Tuesday, November 1, 1988, in the morning, Norman DeVoe had still not called in at St. Louis.

(Dunning affidavit, ¶ 17).

27. Plaintiff heard from Dennis Stallings of Medi–Dyn that permanent supervisor positions paid approximately $24,000 per year. Plaintiff alleges that he received less than this amount upon his transfer to St. Louis, although he does not specify how much less he received.

## II. *Grounds for Summary Judgment*

### A. Omission of Material Facts

■ Defendant argues that all of plaintiff's Title VII claims must be dismissed due to the failure of plaintiff to disclose certain facts material to the decision to hire him. Defendant alleges that it would not have hired plaintiff if it had been aware of his credit problems and his problems gaining out-of-state custody over his son, and therefore, that plaintiff has no remedy under Title VII.

In support of its position, defendant relies on *Summers v. State Farm Mutual Auto. Ins. Co.,* 864 F.2d 700 (10th Cir.1988) and its progeny. The plaintiff in *Summers* alleged that he had been fired for age and religious reasons, although the defendant maintained that it had fired plaintiff because of plaintiff's problems in dealing with the public and his co-workers. After plaintiff had been discharged, defendant discovered numerous incidents in which plaintiff had falsified records during the course of his employment with defendant. Defendant conceded that the reason it had dismissed plaintiff was because of his poor work record, and not because of his falsification of records. *Id.* at 703. Nonetheless, based upon its discovery of plaintiff's falsification of records, defendant moved for summary judgment, which motion was granted by the district court.

The court of appeals affirmed the grant of summary judgment, relying upon the

---

**3.** Plaintiff raises a hearsay objection to the affidavit statements of Mr. Dunning, in which he relates information reported to him by others. The Court will consider this affidavit not to prove the truth of the matter asserted therein, but as evidence of the information that Mr. Dunning alleges to have relied upon in deciding to fire plaintiff. *See* Fed.R.Evid. 801(c).

rationale of *Mt. Healthy City School Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977). In *Mt. Healthy,* the Court held that an adverse employment decision, although actually motivated in "substantial part" by the employee's constitutionally protected conduct, does not justify relief if the employer can demonstrate that it would have made the same decision in any event for permissible reasons. *Id.* at 285–86, 97 S.Ct. at 575. The Court reasoned:

> A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with the rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—*even if the same decision would have been reached had the incident not occurred.* The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct.

*Id.,* quoted in *Summers,* 864 F.2d at 705–06 (emphasis added by *Summers* court). *See also Cunico v. Pueblo School Dist. No. 60,* 917 F.2d 431, 443 n. 13 (10th Cir. 1990) (alternative causation defense under Title VII provides complete defense and not merely limitation of liability). Based upon the *Mt. Healthy* rule of causation, the court in *Summers* held that plaintiff's continuous falsification of company records defeated, as a matter of law, any causal connection between plaintiff's dismissal and the defendant's allegedly illegal motivation. 864 F.2d at 709. *See also Churchman v. Pinkerton's Inc.,* 756 F.Supp. 515 (D.Kan.1991) (summary judgment granted on the basis of material misrepresentations made in the employee's application process); *Mathis v. Boeing Military Air-*

*plane Co.,* 719 F.Supp. 991 (D.Kan.1989) (same).

The critical principle recognized by *Summers, Churchman* and *Mathis* is that the employee's misrepresentations must be *material* to the employment decision. The employee in *Summers* had a long history of falsifying hundreds of records. His employer had discovered many incidents of falsification before the employee was dismissed, and had warned the employee that further incidents would result in his dismissal. In light of his repeated, unrepentant practice of dishonesty, the court held that the employee would have been dismissed even in the absence of the allegedly improper motivations, and that he had failed to demonstrate a genuine issue of fact on this issue. Similarly, *Churchman* involved a litany of misrepresentations that bore directly on the applicant's suitability for employment as a security guard. Moreover, there was evidence in *Churchman* that the employer had "consistently terminated employees who ha[d] been discovered to have materially falsified their employment application." 756 F.Supp. at 518, ¶ 12.

Based on the evidence before it, the Court cannot say as a matter of law that defendant would have made the same employment decisions in plaintiff's case if it had been aware of the alleged misrepresentations. Indeed, the action actually taken by defendant belies its assertion that plaintiff was "unqualified" for employment. When Dunning learned of plaintiff's legal problems of gaining full custody of his son, Dunning did not dismiss plaintiff, or even intimate that it was considering dismissal for his failure to disclose this unsolicited information. Rather, Dunning only stated that he often handled legal matters by telephone. (Defendant's Statement of Facts, ¶ 15). Interestingly, defendant does not argue that plaintiff was required to reveal his car problems on his application, although this appears to be the most direct cause of plaintiff's failure to report to work. Defendant's argument suggests that the failure to disclose every circumstance in a person's personal life, which eventually might lead to some isolated dis-

ruption of the person's work habits, may serve as a *post facto* pretext justifying that person's dismissal. However, as the court recognized in *O'Driscoll v. Hercules, Inc.*, 745 F.Supp. 656, 659 (D.Utah 1990), the rule of *Summers* does not allow an employer to "comb[ ] an employee's file after a discriminatory termination to discover minor, trivial, or technical infractions...."

In addition, Medi–Dyn offers no evidence of past instances where it has refused to hire persons who have "personal problems that would impede transfer." (Dunning affidavit, ¶ 4). *See Milligan–Jensen v. Michigan Technological Univ.*, 767 F.Supp. 1403, 1416 (W.D.Mich.1991) (finding that employee with drunk driving conviction would still have been hired, because employer did not have strict policy of refusing to hire anyone with drunk driving conviction); *Punahele v. United Air Lines, Inc.*, 756 F.Supp. 487, 491 (D.Colo.1991) (genuine issue of fact remained whether employer followed procedure by asking for a tardiness record and whether plaintiff's tardiness record and conviction would have affected employer's decision to hire plaintiff). The absence of past instances of a refusal to hire for similar reasons is not necessarily fatal to defendant's claim that it would not have hired plaintiff. But the absence of such evidence does affect the credibility of defendant's claim. Even assuming defendant does not hire persons with "personal problems" potentially affecting their ability to transfer at a moment's notice, genuine issues of fact remain regarding whether plaintiff's problems were so severe as to foreclose the possibility that defendant would have hired him in any event.

The causal connection between plaintiff's personal problems and his dismissal is simply too tenuous to permit a grant of summary judgment.

### B. Failure to Exhaust Administrative Remedies

Defendant argues alternatively that the all of plaintiff's Title VII claims, except discriminatory transfer, must be dismissed because plaintiff failed to exhaust his administrative remedies. Although it is difficult to discern from the complaint, it appears that plaintiff seeks damages for three alleged acts of employment discrimination: (1) forced transfer to St. Louis; (2) wrongful termination: (3) disparate pay.

After plaintiff's discharge, plaintiff filed a timely charge with the Kansas Commission on Civil Rights ("KCCR"). In this charge, plaintiff stated:

I. I am a black person.

A. I was hired by the Respondent in June, 1988, and worked as a supervisor out of St. Francis Hospital in Wichita, Kansas.

B. On or about October 1, 1988, Mr. Dunning told me they needed a second shift supervisor in St. Louis, and that I was to leave the next day. I told him I could not leave that soon. He then offered the position to a white supervisor, and this supervisor refused to go.

C. On or about October 7, 1988, Mr. Dunning told me that I had to go. When I again refused he threatened me with termination. He did not so threaten the white supervisor. I then took the transfer.

II. I feel these acts on the part of the Respondent and its representatives are due to my race.

III. I hereby charge Medi–Dyn, Inc. and its representatives with a direct violation of the Kansas Act Against Discrimination in that I was forced to transfer and threated [sic] with termination due to my race, black.

(Eht. 8 to DeVoe Deposition).

The exhaustion of administrative remedies is a non-jurisdictional prerequisite to litigation of Title VII cases in federal court. *Zipes v. Trans–World Airlines, Inc.*, 455 U.S. 385, 393, 102 S.Ct. 1127, 1132, 71 L.Ed.2d 234 (1982); *Gulley v. Orr*, 905 F.2d 1383, 1384 (10th Cir.1990). The purpose of the exhaustion requirement is to allow the administrative agencies charged with the responsibility for enforcing the civil rights laws the opportunity to investigate and conciliate claimed violations. *Jensen v. Board of County Comm'rs for Sedgwick County*, 636

F.Supp. 293, 300 (D.Kan.1986) (quoting *Evans v. U.S. Pipe & Foundry Co.*, 696 F.2d 925, 929 (11th Cir.1983)).

■ A necessary corollary of the exhaustion requirement is that the scope of the federal action must be limited by the scope of the administrative charge. *Moore v. Norfolk & Western Ry. Co.*, 731 F.Supp. 1015, 1017–18 (D.Kan.1990); *Jensen*, 636 F.Supp. at 300. Although an identity of claims presented is not required, *Woods v. Missouri Dept. of Mental Health*, 581 F.Supp. 437, 444 (W.D.Mo.1984), new claims presented in the federal civil action may be entertained "only if they are 'like or reasonably related to the allegations of the charge and growing out of such allegations.' " *Jensen*, at 300 (citations omitted). Finally, the court applies a particularly lenient standard in reviewing an administrative charge drafted by a person unrepresented by counsel. *Moore*, 731 F.Supp. at 1018 (plaintiff unrepresented before the EEOC could maintain a federal action for "improper furlough," even though the EEOC claim only alleged "racial discrimination in the terms and conditions of employment"); *Harris v. First Nat'l Bank of Hutchinson*, 680 F.Supp. 1489, 1495 (D.Kan.1987).

As an initial matter, the Court notes that the parties do not agree whether plaintiff was represented by counsel before the KCCR. Plaintiff has submitted an affidavit in which he attempts to minimize the extent of counsel's administrative representation of plaintiff. Plaintiff avers that he "entered into no extended representation agreement" prior to the filing of the administrative charge, and that plaintiff "understood that he would rely upon the [KCCR] to draft his complaint and conduct an investigation." (DeVoe affidavit, Doc. 29, at 3). In light of this averment, and of counsel's representations as an officer of this Court,

the Court finds that plaintiff drafted the KCCR complaint without the assistance of counsel. Thus, the Court will review the KCCR charge under a lenient standard of scrutiny.

■ The Court finds that the factual circumstances of plaintiff's termination are sufficiently related to the charge of forced transfer contained in the KCCR complaint. Thus, plaintiff has exhausted his administrative remedies both as to his forced transfer and wrongful termination claims. The Court does not find, however, that any claim of disparate pay treatment can be rationally inferred from the subject matter of the KCCR charge. Thus, to the extent that plaintiff's complaint is construed to allege discrimination in pay, such claim is barred for failure to exhaust his administrative remedies.[4]

## C. Failure to Establish a Genuine Issue of Fact ·

Defendant's final argument challenges the sufficiency of plaintiff's Title VII claims under the shifting burdens of production outlined by the Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

■ The plaintiff must first establish a prima facie case of discrimination. In order to satisfy this first step, the plaintiff must show that: (1) he belongs to a protected class or minority; (2) he was qualified for the job from which he was dismissed; (3) he was terminated despite his qualifications; (4) after he was dismissed the job remained open, and the employer sought applicants who were no better qualified. *McDonnell Douglas*, 411 U.S. at

---

**4.** Given the Court's ultimate disposition of this case, recovery on plaintiff's claim of disparate pay would be defeated in any event. Because the Court finds that defendant dismissed plaintiff for legitimate business reasons, plaintiff has suffered no injury that would entitle him to backpay in any amount. *See Albemarle Paper Co. v. Moody*, 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975) (purpose of Title

VII is to make persons whole for illegal discrimination); *Cunico v. Pueblo School Dist. No. 60*, 917 F.2d 431, 443 (10th Cir.1990).

Moreover, plaintiff has offered no evidence to controvert defendant's supported averment that plaintiff's salary at all times conformed to defendant's established salary scale. (Defendant's Statement of Fact ¶ 47, Doc. 13 at pp. 15–16).

802, 93 S.Ct. at 1824. The prima facie case raises a rebuttable presumption of discrimination. *Burdine,* 450 U.S. at 254, 101 S.Ct. at 1094.

■■■ Second, once the plaintiff establishes a prima facie case, the burden shifts to the defendant employer to articulate a legitimate, non-discriminatory reason for dismissing the plaintiff. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. at 1824. Finally, if the defendant sustains this burden, the plaintiff must demonstrate that the articulated reason is a mere pretext. *McDonnell Douglas,* 411 U.S. at 803, 93 S.Ct. at 1824–25; *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94. "A plaintiff may prove pretext by showing that the employer, more likely than not, was motivated by a discriminatory reason or that the employer's explanation is not credible." *Trujillo v. Grand Junction Regional Center,* 928 F.2d 973, 977 (10th Cir.1991). Throughout this process, the ultimate burden of persuasion rests with the plaintiff to prove that the defendant intentionally discriminated against plaintiff. *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94.

### 1. *Forced Transfer*

■■■ As to plaintiff's claim of discriminatory forced transfer, the *McDonnell Douglas* test must be modified. *See Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 576, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978) (*McDonnell Douglas* analyses may be modified for different fact patterns to accommodate any adverse employment decision). Plaintiff alleges that there were two other persons qualified for transfer who were not selected, and that plaintiff was selected for transfer on the basis of his race. Thus, the Court will incorporate this allegation into its modification of the *McDonnell Douglas* test.

Defendant argues that plaintiff cannot establish a prima facie case of discriminatory forced transfer because the transfer was not "adverse." According to defendant, plaintiff was hired and trained for transfer to another location, and the decision to transfer him therefore cannot be considered an adverse employment decision.

The Court cannot agree. Even allowing that defendant trained plaintiff with the expectation of transfer, the substance of plaintiff's allegation is that his employer singled him out for transfer to an unfavorable position on the basis of race, and that equally eligible white candidates could have been selected. Accepting the truth of this allegation, it would matter little that defendant has a contract allowing it to transfer plaintiff. Conduct actually motivated by discrimination violates Title VII notwithstanding contractual language otherwise allowing such conduct. *See Campbell v. Board of Regents of Kansas,* 770 F.Supp. 1479, 1490 (D.Kan.1991).

Plaintiff calls attention to two white individuals who are alleged to have been eligible for transfer over plaintiff: Randy Scott, who had been hired on December 30, 1987 and completed training during January 1988; and Jim Mahlum who had been hired on August 7, 1988 and had been in training nearly 8 weeks. The admitted facts appear to support plaintiff's contention that these persons were qualified for the position in St. Louis. Thus, the Court finds that plaintiff has established a prima facie case as to his forced transfer claim.

The plaintiff who successfully establishes a prima facie case of discrimination does not automatically survive a summary judgment motion. *MacDonald v. Eastern Wyoming Mental Health Center,* 941 F.2d 1115, 1121 (10th Cir.1991). Under the second step of *McDonnell Douglas,* defendant must articulate a legitimate nondiscriminatory reason for the decision to transfer plaintiff rather than the other qualified white individuals.

■■■ Defendant states that Randy Scott had more prior management experience than was needed for the St. Louis position, and that he was qualified for a job entailing more responsibility. According to defendant, Scott was being considered for an Assistant Director position, which is one management level higher than the Supervisor position in St. Louis, and was in fact transferred to an Assistant Director posi-

tion in Houston, Texas a few months later. (Defendant's Statement of Facts, ¶ 54, Doc. 13 at 17). Plaintiff offers nothing to controvert defendant's proffered explanation, and instead denies this allegation on the ground that he has been prevented from conducting unspecified discovery to form a belief as to this explanation. (Plaintiff's Memo. in Opposition, Doc. 28, at 10).[5]

Defendant asserts that Jim Mahlum was not selected because Mahlum, unlike plaintiff, had not completed his training. Plaintiff specifically admits that he "was Medi–Dyn's first choice for the job, had more seniority than Mahlum, and was finished with his training." (Defendant's Statement of Fact, ¶ 55; Plaintiff's Statement of Fact, ¶ 27).

The Court finds that defendant has articulated a legitimate business reason for selecting plaintiff for transfer, and that plaintiff has produced no evidence allowing an inference of discrimination in its decision. Indeed, in response to plaintiff's discovery request, defendant has identified 8 employees, all white, since 1986 who either resigned or were fired for refusing to transfer. (Defendant's Answers to Plaintiff's First Set of Interrogatories, Attachment to Doc. 27). Shortly after plaintiff was fired, two white males were also terminated for refusing to accept transfers. (Defendant's Statement of Fact, ¶ 45). Plaintiff offers nothing to inform the Court of the utility of further discovery that would controvert these facts.

The Court finds that plaintiff has failed to demonstrate a genuine issue of fact with respect to his claim of pretext. Although direct evidence of a discriminatory intent is not required under the *McDonnell Douglas*

formulation, *United States Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 714 n. 3, 103 S.Ct. 1478, 1481 n. 3, 75 L.Ed.2d 403 (1983), a claim of discriminatory treatment may not be based on "surmise and conjecture." *See Alires v. Amoco Prod. Co.*, 774 F.2d 409, 411 (10th Cir. 1985). "To avoid summary judgment, a party must produce *'specific* facts showing that there remains a genuine issue for trial' and evidence ' "significantly probative" as to any [material] fact claimed to be disputed.'" *Branson v. Price River Coal Co.*, 853 F.2d 768, 771–72 (10th Cir.1988) (emphasis in original; quotations omitted). *See also Washington v. Board of Public Utilities*, 939 F.2d 901, 903–04 (10th Cir. 1991) (nothing in evidentiary record to indicate improper motivation). Thus, plaintiff's "mere conjecture that [his] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson*, 853 F.2d at 772 (employer entitled to summary judgment on discriminatory discharge claim, notwithstanding plaintiff's refusal to accept employer's offer to transfer to position plaintiff considered to involve "intolerable working conditions").

### 2. Discriminatory Discharge

 According to the affidavit of Mr. Dunning, plaintiff was discharged for job abandonment. This circuit has recently cautioned against giving dispositive weight to a defendant's proffered reasons for discharge in evaluating the sufficiency of a plaintiff's prima facie case. In *MacDonald v. Eastern Wyoming Mental Health Center*, 941 F.2d 1115, 1121 (10th Cir.1991), an age discrimination case, the court held that "a plaintiff may make out a prima facie

---

**5.** There is no merit to plaintiff's claim that he has been "prevented" from conducting discovery that would enable him to form a belief as to defendant's proffered business reason. Plaintiff has requested the entire personnel file of Scott, which defendant has refused to produce on the ground of irrelevancy. (Doc. 27, 1st Attachment, at p. 4). Defendant states that it has produced, however, the training and work records of Scott, which the Court believes to be sufficient to enable plaintiff to inform himself of the validity of defendant's claim. Moreover, Plaintiff's Motion to Compel Discovery is noth-

ing more than a two-page motion for defendant to produce all items to which defendant has objected. Plaintiff's Motion to Compel Discovery is unaccompanied by supporting a memorandum and does not inform the Court of the relevancy of the entire personnel file of Scott. Plaintiff's sought discovery is subject to denial on these grounds alone. *See* D.Kan.Rule 206(a) (all motions to be accompanied by a brief or memorandum). To date, nothing has prevented plaintiff from obtaining discovery of any matter other than his lack of zeal in seeking discovery.

case of discrimination in a discharge case by credible evidence that she continued to possess the objective qualifications she held when she was hired, or by her own testimony that her work was satisfactory, even when disputed by her employer, or by evidence that she had held her position for a significant period of time." (citations omitted). Thus, under the holding of *MacDonald*, the employer's stated business justification for discharge should normally be evaluated on the issue of pretext, rather than in assessing the existence of a prima facie case. *Id.*

In accordance with the holding of *MacDonald*, the Court finds that plaintiff has established a prima facie case of discriminatory discharge, and that defendant's explanation for discharging plaintiff should be evaluated on the issue of pretext.

As with the claim of discriminatory transfer, plaintiff provides the Court with no evidence suggesting that defendant's proffered explanation for dismissing plaintiff is a pretext for illegal discrimination.[6] The Court is mindful that it is neither the duty, nor within the expertise of courts, to determine whether business decisions were right or wrong, but only whether they are lawful. *Verniero v. Air Force Academy School Dist. No. 20*, 705 F.2d 388, 390 (10th Cir.1983); *Branson*, 853 F.2d at 772. Although courts should exercise caution in granting summary judgment in discrimination cases when motivation and intent are at issue, *Schwenke v. Skaggs Alpha Beta, Inc.*, 858 F.2d 627, 628 (10th Cir.1988) (quoting *Foster v. Arcata Assocs., Inc.*, 772 F.2d 1453, 1459 (9th Cir.1985)), this procedural device is proper for the "obvious cases [that] should be weeded out before trial." *Summers v. State Farm Mutual*

*Auto. Ins. Co.*, 864 F.2d 700, 709 (10th Cir.1988). Thus, the Court will dismiss the claim of discriminatory discharge.

### D. Pendent State Claims

With the dismissal of all federal claims to this action, the Court is guided by the principles enunciated in *Thatcher Enters. v. Cache County Corp.*, 902 F.2d 1472 (10th Cir.1990):

A district court may not exercise pendent jurisdiction over a state law claim when the federal law claim is insubstantial. If the federal claim is dismissed before trial, even though not insubstantial in the jurisdictional sense, the state law claim will generally be dismissed as well. Notions of comity and federalism demand that a state court try its own lawsuits, absent compelling reasons to the contrary. The district court has discretion to try state claims in the absence of any triable federal claims; however, that discretion should be exercised in those cases in which, given the nature and extent of pretrial proceedings, judicial economy, convenience, and fairness would be served by retaining jurisdiction.

*Id.* at 1478 (citation omitted). The Court finds no compelling reason to exercise pendent jurisdiction over plaintiff's single remaining state claim for breach of employment agreement (Doc. 1, ¶ 12, Second Claim), and will therefore dismiss this claim without prejudice. *See Bath v. National Ass'n of Intercollegiate Athletics*, 843 F.2d 1315, 1317 (10th Cir.1988) (dismissal of pendent state claims not on the merits must be without prejudice).

Accordingly, the Court hereby grants defendant's motion (Doc. 12) for summary

---

**6.** Plaintiff has requested "the names and race of any Medi–Dyn, Inc. employees, in the period from 1986 to present, terminated for missing work without notifying his or her immediate supervisor." (Defendant's Answers to Plaintiff's First Set of Interrogatories, Doc. 27, Second Attachment at p. 4). Defendant has objected to this request as overbroad but also states that it "is unaware of any Medi–Dyn supervisory employee who ever missed work with no notice or explanation to Medi–Dyn, except plaintiff, and only plaintiff was terminated for that reason." *Id.*

The Court finds defendant's objection to be meritorious and therefore sustains the objection. As noted, plaintiff's entire Motion to Compel is subject to denial for failure to present any argument. *See supra* note 5. Moreover, allowing discovery as to the requested matter could establish nothing to support plaintiff's claim. If defendant is able to produce the names of other persons of any race terminated for missing work, this would only establish that defendant acted consistent with a legitimate policy when it fired plaintiff.

judgment on all federal claims and on the state claim sounding in wrongful discharge. The Court dismisses the remaining state claim for breach of employment agreement without prejudice. Pursuant to Fed.R.Civ.P. 58, the Clerk shall enter final judgment in defendant's favor.

IT IS SO ORDERED.