**V. Ray SUMMERS, Plaintiff–Appellant,**

v.

**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Defendant–Appellee.**

No. 87–1087.

United States Court of Appeals, Tenth Circuit.

Dec. 30, 1988.

John B. Wilson (Mark S. Webber of Parsons, Behle & Latimer, with him on the brief), Salt Lake City, Utah, for plaintiff-appellant.

Glenn C. Hanni (Robert A. Burton and Kevin P. McBride of Strong & Hanni, with him on the brief), Salt Lake City, Utah, for defendant-appellee.

Before LOGAN, MOORE, and McWILLIAMS, Circuit Judges.

McWILLIAMS, Circuit Judge.

On May 19, 1982, V. Ray Summers, a field claims representative for State Farm Mutual Automobile Insurance Company, was fired. A written notice explained that State Farm's reasons for Summers' discharge included his falsification of company records, untimely and poor quality of reporting, problems with settlement negotiations and customer relations, and his generally poor attitude.

On April 19, 1983, Summers brought the instant action in the United States District

Court for the District of Utah. The gist of Summers' complaint was that State Farm had unlawfully fired him because of his age and religion. Summers was a 56 year old member of the Mormon Church at the time of his discharge. The complaint named State Farm and four individuals who were Summers' supervisors at State Farm as defendants.

In 1984, the district court granted summary judgment in favor of all individual defendants on all claims. The district court also granted summary judgment in favor of State Farm on Summers' pendent claims of wrongful discharge and intentional infliction of emotional distress. However, the district court denied State Farm's motion for summary judgment on Summers' claims based on unlawful firing because of age and religion. Summers has not appealed the 1984 order dismissing all of his claims against the individual defendants and his pendent claims against State Farm.

The case thereafter proceeded against State Farm only on Summers' claims of wrongful termination because of age, 29 U.S.C. §§ 621–634 (1967 as amended), and because of religion, 42 U.S.C. §§ 2000e–2(a), 3(a) (1964 as amended). After extensive discovery, State Farm moved a second time for summary judgment. The district court, with only limited comment, granted the motion and entered judgment in favor of State Farm. Summers appeals. We affirm.

The facts in this case, all of which were before the district court when the hearing was held on State Farm's second motion for summary judgment, are not seriously disputed. Summers began working for State Farm in 1963, initially working for one year in State Farm's office at Ogden, Utah. In 1964, he was transferred to State Farm's office in Logan, Utah, where he continued to work until his discharge in 1982. Summers' basic duties were to settle claims made against State Farm, which included an investigation of the facts giving rise to a claim, a review of the policy provisions concerning coverage, a determination and verification of damages claimed, and the issuance of a draft in exchange for a release. Summers was encouraged by State Farm to adjust claims quickly, but was also told of the importance of "covering the file," or insuring that all sums paid by State Farm were "backed up" by documentation.

From 1963 to July, 1980, Summers' employment record with State Farm was satisfactory. However, in July, 1980, it was discovered that Summers had forged the signature of a representative of Monsanto Chemical Company to document a "loss-of-wages" claim made by one of Monsanto's employees. Summers did not dispute the falsification and was warned that another such falsification could result in dismissal.

In September, 1981, State Farm discovered evidence regarding a 1977 incident where Summers had falsified various medical and pharmacy bills for medical services and drugs which State Farm's insured supposedly had received, though, in fact, she had not. Again Summers was advised that he should not falsify company records and was warned that future falsifications would result in discharge.

As a result of the September, 1981, discovery, State Farm examined approximately 90 randomly selected files involving claims Summers had handled for State Farm, and concluded that seven or eight of these were "suspicious." Again Summers was confronted with these additional suspected falsifications, and warned that he should never again falsify company records. Notwithstanding his admission that he had falsified some records, Summers was not fired, but was placed on probationary status for two weeks without pay. In opting for probationary status as opposed to discharge, State Farm officials indicated they were influenced by the fact that Summers did not personally profit from any of these falsifications.

On October 8, 1981, Summers returned to work from his probationary status and was again warned about the consequence of any future falsifications of State Farm records. Summers continued to work for State Farm until he was discharged on May 19, 1982. State Farm officials conceded that Summers was *not* fired because of his

falsification of records, but because of his poor attitude, inability to get along with fellow employees and customers, and similar problems in dealing with the public and co-workers.

In early 1986, nearly four years after Summers' discharge, State Farm, when preparing for trial, made a thorough examination of records prepared by Summers and discovered over 150 instances where Summers had falsified records, with 18 of those falsifications occurring *after* Summers returned to work from his probationary status. Summers, in his depositions, did not deny these falsifications.

On April 24, 1986, counsel for Summers filed a motion *in limine*, seeking a pretrial ruling which would bar State Farm from using at trial the falsifications discovered in its 1986 investigation of Summers' files. On May 22, 1986, the district court held a status conference to determine, in view of all the circumstances, whether the trial date of June 2, 1986 was realistic. Finding that it was not realistic, the court reset the case for trial on January 5, 1987, and ordered that a final pretrial and status conference be held on December 2, 1986, at which time "motions may be heard and evidentiary and other pretrial matters may be discussed."

On November 26, 1986, State Farm filed a renewed motion for summary judgment based "on the depositions, exhibits, records, and files of this case, together with the brief herewith submitted in support of this motion." The basis for this renewed motion for summary judgment was State Farm's discovery of 150 "new" falsifications.[1]

The final pretrial conference was held on December 2, 1986, with the case set for trial on January 5, 1987. At that time the only two pending motions were Summers' motion *in limine* filed April 24, 1986 and State Farm's motion for summary judgment filed November 26, 1986. Summers was present at the December 2 hearing and personally participated in that hearing. After argument by counsel, the district court granted State Farm's second motion for summary judgment, which rendered a formal order on Summers' motion *in limine* unnecessary.

### I.  *10–Day Rule*

■  Fed.R.Civ.P. 56(c) provides that a motion for summary judgment shall be served at least 10 days before the time fixed for hearing. The purpose behind the 10–day rule is to allow the nonmover the opportunity to prepare responsive pleadings and counteraffidavits and to otherwise oppose the motion. C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil 2d § 2719 (1983). In the instant case, State Farm's motion for summary judgment was filed November 26, 1986, and was heard and determined 7 days later, on December 2, 1987. Although the 10–day rule was not urged to the district court by trial counsel, different counsel, on appeal, argue that the judgment should be reversed for failure to observe the 10–day rule and that the case should be remanded to allow Summers the opportunity to respond to State Farm's motion for summary judgment. The 10–day rule contained in Fed.R.Civ.P. 56(c) is not an absolute and can be waived. *Prospero Assocs. v. Burroughs Corp.* 714 F.2d 1022 (10th Cir.1983), and *Mustang Fuel Corp. v. Youngstown Sheet and Tube Co.*, 480 F.2d 607 (10th Cir.1973). In our view, the 10–day rule was waived in the instant case.

■  At the December 2 hearing, the district court noted that there were two pending motions: Summers' motion *in limine* and State Farm's motion for summary judgment. The district court also noted that the latter motion "may not be ripe for full argument." Despite this signal, there was no request by counsel that the hearing on the motion for summary judgment be delayed. Instead counsel stated that the

---

**1.** As indicated above, State Farm filed a motion for summary judgment in 1984, which was granted as to Summers' claim of wrongful discharge and intentional infliction of emotional distress, but denied as to Summers' claims of discrimination based on age and religion. State Farm's 1984 motion for summary judgment related to the reasons given by it in 1982 for discharging Summers.

"law" involved in the summary judgment motion "is the same law that we're talking about in our motion *in limine*." As stated above, Summers' motion *in limine* sought to preclude State Farm's use at trial of the evidence of additional falsifications which State Farm found in early 1986. These additional falsifications, in turn, were also the basis for State Farm's renewed motion for summary judgment. Argument relating to both motions ensued. Summers' presented a six-page affidavit which he had personally prepared. The affidavit was not notarized, but counsel commented concerning the contents of the affidavit, as did Summers himself. The affidavit proper was formally filed with the court sometime after December 2, 1986. The contents related primarily to instructions given Summers by State Farm officials when he was starting his employment and did not bear, for example, on the 18 falsifications made by Summers *after* he resumed his employment upon coming back from his probationary period.

Under similar circumstances, the Sixth Circuit has found a waiver of the 10–day rule. *Thacker v. Whitehead,* 548 F.2d 634 (6th Cir.1977). In *Thacker,* a motion for summary judgment filed by the defendant was heard and granted three days after it was filed. In affirming, the Sixth Circuit noted that plaintiff's counsel participated in the oral argument and did not request additional time to file counteraffidavits or indicate that additional time was needed. The court further indicated that trial counsel did not assert the 10–day argument in the district court, nor did they move in the district court to vacate the summary judgment on the grounds of insufficient time to respond. All things considered, we find *Thacker* persuasive and hold that Summers has waived the conditions of Fed.R.Civ.P. 56(c).

There is the definite suggestion on appeal that counsel representing Summers at the hearing on December 2 wanted to withdraw because of differences between himself and his client. Counsel did advise the court of such differences and indicated that he might not be able to proceed to trial on the appointed trial date of January 5, 1987.

However, we find nothing in the transcript of the December 2 hearing indicating that counsel wanted to withdraw at that time. Rather he proceeded to argue his motion *in limine,* which, if granted, would necessarily have defeated State Farm's motion for summary judgment. Consequently, Summers was adequately represented in the hearing and the fact that counsel expressed some reservations has no bearing on this appeal.

## II. *Use of Evidence of Employee Misconduct Not Known by the Employer at Date of Discharge*

■ As indicated, in the process of preparing for trial, State Farm discovered 150 additional falsifications. After they were apprised of these additional falsifications, Summers' counsel filed a motion *in limine* seeking a pretrial order that State Farm be precluded from offering any evidence relating to the newly found falsifications and that it be limited to presenting evidence which related to the reasons given by State Farm in 1982 for Summers' firing. It was Summers' position in the district court, as it is in this court, that since they were not discovered until 1986, these additional falsifications are irrelevant and inadmissible, and that, accordingly, the fact finder should not even know of them.

State Farm's position is that although the additional falsifications discovered in 1986 could not have been a "cause" or "reason" for Summers' discharge in 1982 since they were unknown to State Farm at the time of the dismissal, these additional falsifications may, and should be, considered in determining what relief, or remedy, is available to Summers. Under the circumstances of this case, State Farm argues, Summers should not be given any relief. We are in general accord with State Farm's position.

At the outset we believe that the litany of *McDonnell Douglas* has little application to the present case. *McDonnell Douglas v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In that case the Supreme Court held that in a Title VII case a discharged employee has the initial

burden of establishing a *prima facie* case of racial discrimination, and that when that burden is met, "the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Id.* at 802, 93 S.Ct. at 1824. Once such a legitimate reason is articulated, the employee should "be afforded a fair opportunity to show that petitioner's [employer's] stated reason was pretext." *Id.* at 804, 93 S.Ct. at 1825. *McDonnell Douglas* clearly presupposes a "legitimate, nondiscriminatory reason" *known* to the employer at the time of the employee's discharge. *Id.* at 802, 93 S.Ct. at 1824. *McDonnell Douglas* was applicable when the district court considered State Farm's first motion for summary judgment which brought into play the reasons given by State Farm in 1982 for discharging Summers. But we are not here concerned with the reasons for discharge given by State Farm in 1982. Rather, we are concerned with the significance, if any, of State Farm's 1986 discovery of the additional falsifications made by Summers when he was an employee of State Farm. As indicated, Summers' position is that evidence of these multitudinous falsifications, not known in 1982 and discovered in 1986, should play no role in the present proceeding and should be ignored. We cannot agree.

Counsel has not directed us to any reported case on all fours with the present one. In support of its argument that evidence of Summers' pervasive misconduct discovered in 1986, which State Farm did not know about when it discharged Summers in 1982, bars Summers from any relief, State Farm relies on the rationale of such cases as *Mt. Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Blalock v. Metals Trades, Inc.*, 775 F.2d 703 (6th Cir.1985); *Smallwood v. United Airlines, Inc.*, 728 F.2d 614 (4th Cir.1984), *cert. denied*, 469 U.S. 832, 105 S.Ct. 120, 83 L.Ed.2d 62 (1984); and *Murnane v. American Airlines*, 667 F.2d 98 (D.C.Cir.1981).

In *Mt. Healthy*, a teacher was not rehired because of a "notable lack of tact in handling professional matters." More spe-cifically, the School Board gave the teacher two reasons for its decision: (1) the teacher conveyed to a local disc jockey the substance of an internal memorandum concerning a possible dress code for teachers which the disc jockey promptly announced on the air as a news item; and (2) the teacher made obscene gestures to two female students. The teacher then sued the Board claiming that the Board violated his First and Fourteenth Amendment rights by discharging him for engaging in constitutionally protected conduct. After a bench trial, the district court found that the teacher's call to the radio station was clearly protected by the First Amendment and that the call played a "substantial part" in the Board's decision not to rehire. At the same time, the district court indicated that the Board, in fact, had another reason for the discharge. This other reason, the obscene gesture incident, was "independent of any First Amendment right." In spite of this independent reason, the district court still found that the teacher was entitled to reinstatement with backpay. On appeal, the Sixth Circuit affirmed.

On certiorari, the Supreme Court reversed and remanded for further proceedings. The Supreme Court held that the fact that conduct protected by the First Amendment played a substantial part in the Board's decision not to rehire did not necessarily justify remedial action. The Supreme Court went on to state that if the Board *could* have dismissed the teacher for the obscene gesture incident, and would have done so even if the radio station incident had never come to its attention, then the fact that the protected conduct played a "substantial part" in the Board's decision to discharge would not justify remedial action. In remanding, the Supreme Court spoke as follows:

A rule of causation which focuses solely on whether protected conduct played a part, "substantial" or otherwise, in a decision not to rehire, could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing. The difficulty with the

rule enunciated by the District Court is that it would require reinstatement in cases where a dramatic and perhaps abrasive incident is inevitably on the minds of those responsible for the decision to rehire, and does indeed play a part in that decision—*even if the same decision would have been reached had the incident not occurred.* The constitutional principle at stake is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct. A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. *But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision* [2].

429 U.S. at 285–86, 97 S.Ct. at 575 (emphasis added).

In *Blalock,* a discharged employee brought a Title VII action against his erstwhile employer claiming that he was fired because of his religion. The district court found no religious discrimination and entered judgment for the employer. On appeal, the Sixth Circuit reversed and remanded. In reversing, the Sixth Circuit held that the district court erred in finding no religious discrimination, and that, on the record, the employee had established, *prima facie,* that his "change in religious views was at least a factor in the discharge." 775 F.2d at 709. However, the Sixth Circuit remanded the case to the district court for further proceedings with the comment that the employer could avoid liability under Title VII by showing "that the adverse employment action would have been taken even in the absence of the im-

permissible motivation, and that, therefore, the discriminatory animus was not the cause of the adverse employment action." *Id.* at 712.

In *Smallwood,* Smallwood applied with United Airlines for employment as a flight officer. United refused to process the application because Smallwood was 48 years of age, and United had a rule that an application for a flight officer would not be processed if the applicant was over 35 years of age. Smallwood then sued United under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (1967 as amended). United urged two defenses: (1) the age requirement was a bona fide occupational qualification within the Act, and (2) Smallwood would not have been hired even if there had been no age discrimination. The district court considered only United's first defense and upheld United's age rule. On appeal, the Fourth Circuit reversed, holding United's age rule not to be a bona fide occupational qualification. The case was then remanded with directions that the district court consider United's second defense that Smallwood "wouldn't have been hired anyway." *Smallwood v. United Air Lines, Inc.,* 661 F.2d 303 (4th Cir.1981).

On remand, the district court found for Smallwood. In so doing, the district court allowed United to submit evidence that because Smallwood had previously been fired by another airline for fraud, United would not have hired Smallwood regardless of his age. The district court indicated quite clearly, however, that it was not impressed with this argument because it involved evidence discovered "after the fact" since United did not learn of Smallwood's discharge by another airline, and the circumstances surrounding that discharge, until *after* United refused to process Smallwood's application because of age.

On appeal, the Fourth Circuit reversed and accepted United's defense that they would not have hired Smallwood regardless

---

**2.** On remand, the district court found on the original record that "the Board has established by a preponderance of the evidence that Doyle [the teacher] would not have been renewed because of the incidents—exclusive of the radio incident—which had occurred during the year or so prior to nonrenewal" and accordingly denied the teacher any relief. On appeal, the Sixth Circuit affirmed, holding that the district court's findings were not clearly erroneous. *Doyle v. Mt. Healthy City School District Board of Education,* 670 F.2d 59 (6th Cir.1982).

of age because of his prior discharge by another airline. The court indicated that any other resolution would be clearly erroneous. In addition, the Fourth Circuit disapproved of the district court's reluctance to rely upon an "after-the-fact rationale," commenting that such skepticism was directly contrary to *Mt. Healthy*. In support of their conclusion, the Fourth Circuit pointed to the following language:

> Initially, in this case, the burden was properly placed upon respondent to show that his conduct was constitutionally protected, and that this conduct was a "substantial factor"—or, to put it in other words, that it was a "motivating factor" in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it *would* have reached the same decision as to respondent's re-employment even in the absence of the protected conduct (emphasis added).

*Smallwood*, 728 F.2d at 623 (quoting *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. at 576). The court concluded that:

> In short, the Supreme Court instructed district courts in cases where the issue is such as here that they *"should"* proceed to make the "after-the-fact rationale" which the district court in this case deprecates. Moreover, it nowhere countenanced the idea that the evidence on this issue was to be treated with skepticism; the clear inference is that such evidence was to be weighed by the same standards as other testimony.

*Smallwood*, 728 F.2d at 623.

In *Murnane*, Murnane's application for employment with American Airlines was turned down because of an age rule similar to that in question in *Smallwood*. Murnane brought suit under the Age Discrimination Act and the district court, after trial, held for American on two grounds: (1) the age rule was valid, and (2) Murnane wouldn't have been hired anyway because he was not "competitively qualified" for flight office. On appeal, the District of Columbia Court of Appeals affirmed both holdings of the district court. In concluding that he "wouldn't have been hired anyway" was a valid defense, and that American had proved such a defense, the District of Columbia Circuit cited *East Texas Motor Freight System, Inc. v. Rodriguez*, 431 U.S. 395, 97 S.Ct. 1891, 52 L.Ed.2d 453 (1977), where the Supreme Court commented as follows:

> Even assuming, *arguendo*, that the company's failure even to consider the applications was discriminatory, the company was entitled to prove at trial that the respondents had not been injured because they were not qualified and would not have been hired in any event.

*Id.* at 404, n. 9, 97 S.Ct. at 1897, n. 9.[3]

In support of his position, Summers relies on such cases as *Mantolete v. Bolger*, 767 F.2d 1416 (9th Cir.1985); and *Nanty v. Barrows Co.*, 660 F.2d 1327 (9th Cir.1981). Our reading of those cases indicates that they are really more supportive of State Farm's position on this matter.

In *Mantolete*, an applicant was denied employment by the United States Postal Service because of a physical handicap, epilepsy, which disqualified her for employment as a letter sorter. She brought suit

---

**3.** Summers attempts to distinguish the foregoing cases on the grounds that they are all "application-rejection" cases where the next step in the application process would have been to uncover the facts which establish the legitimate, nondiscriminatory reason for rejecting the application. This distinction is not persuasive for several reasons. First, we have already indicated that the *McDonnell–Douglas* litany does not apply to the present facts. Since we are concerned here with the appropriate remedy, rather than the cause of the dismissal, the probability that Summers' transgressions would have been discovered in the absence of the trial is immaterial. Second, even if we accept Summers' argued-for standard, the evidence establishes that State Farm was aware of Summers' prior transgressions and was monitoring his actions. Consequently, there is a high probability that at least the 18 falsifications occurring after the probationary period would have been discovered. Finally, *Mt. Healthy*, the linchpin case, involved a discharge and was not an application-rejection case. Consequently, we find no meaningful distinction between a case involving the rejection of an application and a case involving the discharge of an employee.

under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–796 (1973 as amended), alleging that the denial was improper. After a trial, judgment was entered for the Postal Service. On appeal, the plaintiff urged as error the denial by the district court of a motion *in limine* to exclude evidence of her physical condition not known to the Postal Services at the time of her rejection but acquired after its decision not to hire. The Ninth Circuit held that although such evidence was not admissible to enlarge the basis upon which the Postal Service rejected the applicant, it was admissible, even though after acquired, to rebut the applicant's claim that she was physically qualified for the position. 767 F.2d at 1424.

In *Nanty*, an American Indian's application for employment as a truck driver was summarily rejected. Three days later two Caucasians were hired as truck drivers. Nanty brought suit under Title VII. One defense was that the two Caucasians hired after the Indian's job rejection were better qualified. The district court found that the Indian was not qualified and entered judgment for the employer. On appeal, that judgment was reversed by the Ninth Circuit. The Ninth Circuit also stated that although the allegedly superior qualifications of the two Caucasians hired were not relevant to a determination of whether there was unlawful discrimination, such facts were relevant to the question of whether Nanty, the American Indian, would have been hired absent such discrimination. In other words, the Ninth Circuit held that even after a finding of unlawful discrimination, an additional determination must be made regarding the plaintiff's right to the job and monetary relief. 660 F.2d at 1333.

In light of these authorities, we think the present case boils down to several key issues. As concerns both of State Farm's motions for summary judgment, it is *as-*

*sumed* that State Farm was motivated, at least in part, if not substantially, because of Summers' age and religion. In its first motion for summary judgment, State Farm argued, unsuccessfully, that there was no genuine issue of material fact and that the reasons given Summers in 1982 for his discharge constituted a nondiscriminatory, legitimate business reason which was nonpretextual. In its second motion for summary judgment, State Farm argued that facts which were discovered in early 1986 established serious and pervasive misconduct by Summers, both predating and postdating his probationary period, which, if known by State Farm in 1982, would have justified discharge, and that State Farm, if it had known then what it learned in 1986, would, indeed, have discharged Summers. Finally, while such after-acquired evidence cannot be said to have been a "cause" for Summers' discharge in 1982, it is relevant to Summers' claim of "injury," and does itself preclude the grant of any present relief or remedy to Summers.

When Summers was placed on probation, State Farm knew of two falsifications, and suspected seven others. Despite that knowledge, State Farm did not discharge Summers, but rather placed him on probation without pay for two weeks. When he was discharged in 1982, the reason given was Summers' generally unsatisfactory job performance. Four years later, State Farm ascertained that there had been 150 falsifications, 18 of which occurred *after* Summers was brought back from probation. To argue, as Summers does, that this after-acquired evidence should be ignored is utterly unrealistic.[4] The present case is akin to the hypothetical wherein a company doctor is fired because of his age, race, religion, and sex and the company, in defending a civil rights action, thereafter discovers that the discharged employee was not a "doctor." In our view, the masquerading doctor would be entitled to no relief, and Summers is in no better position.

---

**4.** The First Circuit has indicated that evidence of employee misconduct not known at the time of demotion, but later ascertained, should be considered by the court. *Jimenez–Fuentes v. Torres Gaztambide*, 807 F.2d 230, 233 (1st Cir. 1986), *rev'd on reh'g on other grounds*, 807 F.2d 236 (1st Cir.1986) (en banc), *cert. denied*, 481

U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987). *See also Leahey v. Federal Express Corp.*, 685 F.Supp. 127 (E.D.Va.1988) (applying *Smallwood* to allow evidence of employee misconduct discovered after discharge in wrongful termination suit).

### III. *Summary Judgment*

 Summers alternatively argues that assuming the relevancy and admissibility of State Farm's evidence of pervasive falsification by Summers of company records, both before and after his probationary period, there still remains genuine issues of material facts which would preclude summary judgment. We agree that courts are, or perhaps were, slow to grant summary judgments in discrimination cases. However, recent cases indicate that even in discrimination cases, summary judgment is not an impossibility, and that obvious cases should be weeded out before trial. *See Schwenke v. Skaggs Alpha Beta, Inc.*, 858 F.2d 627 (10th Cir.1988) and the cases cited therein.

Our study of the present case convinces us that this is one of those cases that should have been weeded out before any trial. As indicated, pretrial preparation by State Farm indicated that Summers had continually falsified company records both before and after warnings that such actions could result in discharge. We do not find Summers, in his several depositions, denying any of these falsifications. On the record before him, the district judge in the instant case did not err in granting State Farm's motion for summary judgment.

JUDGMENT AFFIRMED.