969 F.2d 250
 59 Fair Empl.Prac.Cas. (BNA) 989,
59 Empl. Prac. Dec. P 41,610, 61 USLW 2055
 Eddie WASHINGTON, Plaintiff-Appellant,
v.
LAKE COUNTY, ILLINOIS, Lake County Sheriff's Department, and
Lt. Harry Frossard, Individually and as an Agent of Lake
County, Illinois and of the Lake County Sheriff's
Department, Defendants-Appellees.
 No. 91-1819.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 11, 1992.
Decided July 10, 1992.
 
 Joel S. Siegel, David R. Shannon (argued), Arvey, Hodes, Costello & Burman, Chicago, Ill., for plaintiff-appellant.
 Daniel P. Field (argued), Alan M. Kaplan, Brydges, Riseborough, Morris, Franke & Miller, Waukegan, Ill., for defendants-appellees.
 Before CUMMINGS, Circuit Judge, WOOD, Jr. and ESCHBACH, Senior Circuit Judges.
 CUMMINGS, Circuit Judge.
 
 
 1
 Plaintiff Eddie Washington, an African-American, was fired in 1987 from his position as a jailer at the Lake County Sheriff's Department ("the Department"), allegedly in violation of Title VII of the Civil Rights Act of 1964 as well as 42 U.S.C. §§ 1981 and 1983. The district court granted defendants' motion for summary judgment, holding that even if Washington was fired on account of his race, he is entitled to no relief because he lied on his employment application when he indicated that he had no criminal convictions. 762 F.Supp. 199. Washington in fact pled guilty to criminal trespass in 1974 and was convicted of third-degree assault in 1981, although he served no time in jail for these crimes. Washington appeals the district court's ruling, arguing that there is a genuine issue of material fact whether the Sheriff's department would have hired him if it had known of these prior convictions or would have fired him if it had discovered them.
 
 I.
 
 2
 Washington began working as a jailer at the Department on September 12, 1986. In his employment application, which he completed in April 1986, he checked the box marked "no" next to the following question:
 
 
 3
 Have you ever been convicted of an offense other than a minor traffic violation? (Do not include convictions while a minor and/or convictions sealed by Court order.) If so, please state nature of offense(s), date(s), city and state, and disposition. A conviction record is not an automatic bar to employment and the nature, recency, and disposition of an offense will be considered only as it relates to the job for which you are applying.
 
 
 4
 Washington admits on appeal that his answer to this question was not truthful. In 1974, Washington pled guilty to a criminal trespass charge in East St. Louis and was fined $100. Also, in 1981, Washington was convicted of third-degree assault after a jury trial in St. Louis and received a twenty-eight day sentence, which was suspended in lieu of two years probation. The application signed by Washington contains the following language (although in somewhat smaller print):
 
 
 5
 I agree that if any misrepresentation has been made by me * * *, any offer of employment may be withdrawn or my employment terminated immediately without any obligation or liability to me other than for payment, at the rate agreed upon, for services actually rendered * * *.
 
 
 6
 There is no evidence that the Department has ever rejected an applicant or fired a current employee for falsifying his or her application form. Indeed, there is no evidence that the Department has ever discovered that any other applicant or employee besides Washington has lied on his or her application form.
 
 
 7
 Washington was terminated by the Department on July 13, 1987. At this time, the Department did not know Washington had lied on his job application about his prior convictions. In its letter of termination, the Department stated that Washington had brought "discredit to the Department" because he had been arrested for criminal sexual assault. This charge was soon dropped by the complainant. The letter also noted that Washington's personnel file contained evidence of twelve violations of Department policy, including insubordination and violation of jail security. Washington's complaint alleged that the defendants, in particular Lieutenant Harry Frossard, unfairly singled Washington out because of his race and either falsified or exaggerated the incidents reported in his file. In a May 1, 1989, appraisal, conducted less than two months before he was fired, Washington received all "excellent" and "proficient" ratings, no scores in the "adequate" or "marginal" range, and received additional comments that were uniformly positive. The appraisal did not mention any of Washington's violations of Department rules and regulations.
 
 
 8
 On March 11, 1989, Officer Linda Blau of the Department, who is white, was involved in a hit-and-run accident while in uniform and was arrested for driving under the influence of alcohol and for leaving the scene of an accident. The Department punished Blau for her misconduct by giving her a three-day suspension.
 
 
 9
 In his amended complaint filed February 16, 1989, Washington charged Lake County, Illinois, the Department, and Lieutenant Harry Frossard, individually and in his official capacity, with violating Title VII, 42 U.S.C. § 1981 and 42 U.S.C. § 1983 by discriminating against him based on his race and for violating his procedural due process rights under the Constitution. On July 7, 1989, the district judge entered an order dismissing a number of these claims. After the dust settled, the only claims remaining were a Title VII and a Section 1983 claim against Lake County (the former for racial discrimination and the latter for denial of due process), and a Section 1983 claim against Frossard in his individual capacity based upon racial discrimination. On March 12, 1991, the district court granted summary judgment in defendants' favor on the remaining claims, holding that Washington's case failed under the rationale of Summers v. State Farm Mutual Automobile Insurance Co., 864 F.2d 700 (10th Cir.1988).[1]II.
 
 
 10
 In Summers, an insurance claims representative sued his employer, claiming that he was fired because of his religion and his age. Before being fired, Summers had been placed on probation for falsifying several claims documents, and was warned that he would be fired if he engaged in further falsifications. After later being discharged (for poor attitude, according to his employer), it was discovered that Summers had falsified over 150 documents, including 18 that were falsified after his probation period. 864 F.2d at 702-703. The court concluded:
 
 
 11
 [W]hile such after-acquired evidence cannot be said to have been a "cause" for Summers' discharge in 1982, it is relevant to Summers' claim of "injury," and does itself preclude the grant of any present relief or remedy to Summers. * * * The present case is akin to a hypothetical wherein a company doctor is fired because of his age, race, religion, and sex and the company, in defending a civil rights action, thereafter discovers that the discharged employee was not a "doctor." In our view, the masquerading doctor would be entitled to no relief, and Summers is in no better position.
 
 
 12
 Id. at 708.
 
 
 13
 Although this Court has never squarely adopted the Summers rationale, Washington does not challenge its validity. Two cases in this Court have cited Summers. In Smith v. General Scanning, Inc., 876 F.2d 1315 (7th Cir.1989), the plaintiff Smith had falsified his educational background on his resume, a fact discovered after his discharge. The court stated that "[w]hether [defendant] discriminated against Smith must be decided solely with respect to the reason given for his discharge * * *. His resume fraud is, for this purpose, irrelevant." Id. at 1319. The Court added in dicta, however, that the resume fraud would have been relevant
 
 
 14
 had we concluded that [defendant] violated the ADEA * * *. In that case, it would hardly make sense to order Smith reinstated to a job which he lied to get and from which he properly could be discharged for that lie. See Summers * * *. The same would be true regarding any backpay accumulation after the fraud was discovered.
 
 
 15
 Id. at 1319 n. 2. Additionally, this Court similarly thought injunctive relief would be inappropriate under the Summers rationale for a lawyer who engaged in unethical conduct by failing to reveal how he obtained copies of confidential memoranda. Powers v. Chicago Transit Authority, 890 F.2d 1355, 1360 (7th Cir.1989).[2]
 
 
 16
 Washington's primary argument is that summary judgment was improper because there is a question of fact whether he would have been hired, or would have been fired, if the Department had known about his prior convictions. We review the district court's decision to grant summary judgment de novo. Matuszak v. Torrington Co., 927 F.2d 320, 322 (7th Cir.1991). Summary judgment is proper when the evidence reveals "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.Proc. 56(c). When a summary judgment motion is properly supported, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Id. 56(e). "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249-250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Summary judgment generally should be treated with special caution in discrimination cases; however, the summary judgment procedure is not per se improper simply because issues of motive and intent are involved. Holland v. Jefferson Nat'l Life Ins. Co., 883 F.2d 1307, 1312-1313 (7th Cir.1989).
 
 
 17
 This case presents two factual questions (factual, but of a hypothetical nature) that both parties confusingly intermingle. The first hypothetical question is whether the Department would have hired Washington if it had known about his criminal convictions. The second hypothetical question is whether the Department would have fired Washington if it had discovered his falsehoods concerning these convictions on his application. Washington argues that there is a genuine chance that he would have been hired, or would not have been fired, under these circumstances. The Department refutes both contentions, but seems to suggest that any claim that he would not have been fired is irrelevant because he would not have been hired, and therefore never had any legitimate "entitlement" to the job.
 
 
 18
 Neither party clarifies the relationship between a "would not have hired" standard and a "would have fired" standard. This is perhaps understandable, because Summers did not involve a "falsified application" but rather involved after-acquired evidence of gross misconduct on the job. The only issue in Summers therefore was whether the employer would have fired Summers had it known of the gross misconduct (over 150 falsified documents). The "masquerading doctor" hypothetical in Summers is similarly unhelpful, since it is obvious that a "doctor" without a license would never be hired and also would be fired immediately upon discovery of this fact.[3] The distinction between a "would not have hired" standard and a "would have fired" standard can be important, however. An employer will very likely decide not to hire somebody who misrepresents himself on an application, especially if the misrepresentation concerns a material requirement for the position sought. On the other hand, an employer might be less willing to fire an employee if the misrepresentation is discovered after the employee has started the job and has proven himself to be capable. Bonger v. American Water Works, 789 F.Supp. 1102, 1106 (D.Colo.1992).
 
 
 19
 "Mixed-motive" cases, of which Price Waterhouse v. Hopkins, 490 U.S. 228, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), is the latest, are analogous to this case and therefore provide guidance in deciding which standard is appropriate. In a mixed-motive case, an employer has taken an adverse employment decision against an employee in part because of unlawful discrimination and in part because of a non-discriminatory reason. As in a "resume fraud" case, the issue in a mixed-motive case is whether the plaintiff has actually been injured, and the court is required to undergo a hypothetical inquiry as to what the company would have done under different circumstances. The court in Summers relied heavily on Mt. Healthy City School Dist. Bd. of Education v. Doyle, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), a mixed-motive case involving a teacher who was fired for communicating a school memorandum to a radio station (an action protected by the First Amendment) and making obscene gestures to students (actions not protected by the First Amendment), in concluding that no injury had been shown. In Mt. Healthy, the Supreme Court held that the school board should be permitted to prove that it would have made the same adverse employment decision even if it had not considered the protected conduct. Id. at 287, 97 S.Ct. at 576.
 
 
 20
 Price Waterhouse attempted to clarify the mixed-motive standards in the Title VII context, and is therefore relevant to our case. Although disagreeing on some of the details, six Justices of the Court agreed on the basic framework suggested by Mt. Healthy for dealing with an employment decision that was a result of a mixture of legitimate and illegitimate motives. Even if an employee shows that the decision was based in part on a protected characteristic, the employer is not liable if it can prove that the same decision would have been made regarding that employee if it had not taken that characteristic into account. Id., 490 U.S. at 242, 109 S.Ct. at 1786 (plurality); see also id. at 259-260, 109 S.Ct. at 1795 (White, J., concurring); id. at 261, 109 S.Ct. at 1796 (O'Connor, J., concurring). The employer must prove by a preponderance of evidence that it would have made the same decision. Id. at 244-245, 109 S.Ct. at 1787-88; id. at 259-260, 109 S.Ct. at 1795 (White, J., concurring); id. at 261, 109 S.Ct. at 1796 (O'Connor, J., concurring).[4]
 
 
 21
 Like Price Waterhouse, where discrimination was shown, the Department allows us to assume, arguendo, that it discriminated against Washington because of his race. A finding of discrimination would not matter, it claims, because Washington would have been fired when it discovered that he had lied about his convictions on his application. This is similar to the claim in Price Waterhouse that the plaintiff would have been fired anyway, even assuming some discrimination occurred. The same evidentiary framework is therefore appropriate. In situations involving "after-acquired" evidence, the employer must show by a preponderance of evidence that, if acting in a race-neutral manner, it would have made the same employment decision had it known of the after-acquired evidence.[5] One advantage of this standard is that it weakens the incentive for an employer to engage in a fishing expedition for "minor, trivial or technical infractions" on an employee's application or resume. See O'Driscoll v. Hercules, Inc., 745 F.Supp. 656 (D.Utah 1990).
 
 
 22
 There is some equitable appeal for the conclusion that someone who would not have been hired but for his own fraudulent conduct should not receive any relief from employment discrimination laws for a later employment decision. While this assertion may have some merit if the employment decision challenged is the refusal to hire, it is otherwise ultimately misguided. In the Supreme Court mixed-motive cases, the temporal focus is on the time of the adverse employment decision, and the inquiry is whether the same employment decision would have been made if the protected characteristic or conduct were removed from consideration. There is no reason why this approach should not be used in Summers-type cases.
 
 
 23
 Focusing on whether the applicant would have been hired is an unjustified importation of "property right" concepts into employment discrimination law. The question of whether Washington would have been hired is certainly crucial to his procedural due process claim, because showing a valid property right in his employment is an essential element of such a claim. This supports the district court's decision to dismiss Washington's due process claim (not appealed by Washington) in light of Kawitt v. United States, 842 F.2d 951 (7th Cir.1988).
 
 
 24
 A "property right" in one's job, however, is not a requirement for showing injury in a federal discrimination claim. Title VII, which proscribes discrimination in employment, nowhere mentions the need for a property right. Indeed, it could not be a requirement, since much employment in this country is "at-will," where the employee generally can be fired for any reason or no reason. There is no "at-will" defense to a federal discrimination complaint. Rather, the inquiry in a discrimination case is whether the plaintiff has been treated differently than similarly situated employees because of forbidden grounds. To summarize, the appropriate issue in an employment discrimination case where the plaintiff lied on his application and was later fired for an unrelated reason is whether the employer, acting in a race-neutral fashion, would have fired the employee upon discovery of the misrepresentation, not whether the employer would have hired the employee had it known the truth.[6]
 
 
 25
 Applying this standard to our case, we ultimately conclude that there is no genuine issue of material fact whether Washington would have been fired if the Department had discovered the concealment of his convictions and then treated him in a race-neutral manner. The defendants submitted an affidavit by the Superintendent of the Lake County Jail, Lawrence Lesza, and an affidavit by the Sheriff of Lake County, Clinton Grinnell, both stating that the facts of Washington's convictions, "if known at the time of Washington's employment, would have led to his immediate discharge." These affidavits are essentially uncontradicted. Washington argues that they are not based on personal knowledge but are impermissibly based on information and belief. But even if Lesza and Grinnell would not have been the ultimate decisionmakers, their high-level positions of superintendent and sheriff, respectively, strongly support their assertions of knowledge in the areas of hiring and firing. The burden was on Washington to produce affirmative evidence that punctures their assertion of knowledge regarding these matters, and he produced no such evidence.
 
 
 26
 Although not totally irrelevant as the Department asserts, the handling of Officer Blau's hit-and-run accident as well as Washington's positive appraisal are only marginally relevant to the issue of whether Washington would have been fired. In our hypothetical scenario, Washington would suddenly have two new and substantial strikes on his record: he materially lied on his application, and he had a record of two criminal convictions, one for assault. Officer Blau did not lie on her application, and her criminal act did not involve personal violence, which is relevant to Washington's position as a jailer. Although her three-day suspension raises the metaphysical possibility that white officers might be treated with kid gloves, it was Washington's burden to produce evidence that a white employee in a predicament similar to his was treated less severely, or that an African-American employee in a predicament similar to Blau's was treated more severely. The facts are simply too different to justify directly comparing Blau's and Washington's situations. In addition, Washington's positive appraisal, although relevant, pales in comparison to his misrepresentation and prior convictions, and is also inconsistent with the twelve violations (including insubordination) in his personnel file.[7]
 
 
 27
 Finally, Washington argues that there was no evidence of a Department policy to fire employees who, it is later discovered, lied on their applications. To be sure, this evidence would have bolstered the Department's case. But given the nature of Washington's violations, and the uncontradicted affidavits in the record, the burden shifted to Washington to produce affirmative evidence that he would not have been fired if treated in a race-neutral fashion. It was thus his burden to show that an employee would not have been fired in a "resume fraud" situation, and he has produced no such evidence.
 
 
 28
 For the foregoing reasons, summary judgment is affirmed.
 
 
 
 [1]
 Although only Lake County and Frossard remain as defendants in this case, for convenience we refer to the Department as if it were the sole remaining defendant
 
 
 [2]
 This statement in Powers was either an alternative holding or dicta; the central holding was that dismissal of Powers' case was a proper sanction for failing to obey court orders. Powers and Smith both focus on the inappropriateness of injunctive relief when there is convincing evidence of employee misconduct obtained after the discharge of the employee. Smith implies that the plaintiff, if he otherwise proves his case, is entitled to backpay accumulation between the time of discharge and the time the fraud is discovered. See also Paul J. Gudel, Beyond Causation: The Interpretation of Action and the Mixed Motives Problem in Employment Discrimination Law, 70 Tex.L.Rev. 17, 97 (1991) ("If Title VII is meant to eradicate discrimination in employment, then the acts of the employers in [Summers and its progeny] must be illegal, although the employers might have an argument against reinstatement as a remedy"). Washington does not advance this back pay proposition, however, and therefore we need not consider it
 
 
 [3]
 Most courts that adopt the Summers rationale do not examine the relationship between a "would have fired" standard and a "would not have hired" standard. See Johnson v. Honeywell Information Systems, Inc., 955 F.2d 409, 415 (6th Cir.1992) (affirming directed verdict for Honeywell, concluding, without much analysis, that "Honeywell established that it would not have hired Johnson and that it would have fired her had it become aware of her resume fraud during her employment"); George v. Meyers, No. 91-2308-0, 1992 WL 97777, at *1, 1992 U.S. Dist. LEXIS 6419, at *2-* 3 (D.Kan. April 24, 1992) (granting summary judgment under both standards); Benson v. Quanex Corp., No. 90-CV-71996-DT, 1992 WL 63013, 1992 U.S. Dist. LEXIS 3689 (E.D.Mich. March 24, 1992) (granting summary judgment on the "would not have hired" standard without discussing "would have fired" standard); O'Day v. McDonnell Douglas Helicopter Co., 784 F.Supp. 1466 (D.Ariz.1992) (granting summary judgment under a "would have fired" standard); DeVoe v. Medi-Dyn, Inc., 782 F.Supp. 546 (D.Kan.1992) (denying summary judgment based on a "would not have hired" standard, noting that defendant actually knew of the alleged concealment at the time of firing and did not rely upon it); Grzenia v. Interspec, Inc., No. 91 C 290, 1991 WL 222105, 1991 U.S. Dist. LEXIS 15093 (N.D.Ill. October 21, 1991) (although finding a genuine issue on the "would have hired" standard, granting summary judgment because no genuine issue under the "would have fired" standard); Kristufek v. Hussmann Foodservices Co., No. 87 C 5621, 1991 WL 203799, 1991 U.S. Dist. LEXIS 14287 (N.D.Ill. October 4, 1991) (granting JNOV without clearly distinguishing between the two standards); Churchman v. Pinkerton's, Inc., 756 F.Supp. 515 (D.Kan.1991) (granting summary judgment based on both standards); Punahele v. United Air Lines, 756 F.Supp. 487 (D.Colo.1991) (denying summary judgment based on a "would not have hired" standard); Sweeney v. U-Haul Co., No. 89 C 3761, 1991 WL 1707, 1991 U.S. Dist. LEXIS 268 (N.D.Ill. January 9, 1991) (granting summary judgment based on both standards); O'Driscoll v. Hercules, Inc., 745 F.Supp. 656 (D.Utah 1990) (granting summary judgment under the "would have fired" standard); Mathis v. Boeing Military Airplane Co., 719 F.Supp. 991 (D.Kan.1989) (granting summary judgment for defendant apparently under a "would not have hired" standard)
 
 
 [4]
 Section 107 of the Civil Rights Act of 1991 modified the result in Price Waterhouse by declaring that a party who proves that an illegitimate factor played a motivating role in an unlawful employment practice has established a Title VII violation, even if the employer can show it would have taken the same action in the absence of the illegitimate motivating factor. Civil Rights Act of 1991, Pub.L. No. 102-166, 105 Stat. 1071, § 107. This provision is perhaps inconsistent with Summers, but was not cited by either party
 
 
 [5]
 This conclusion is consistent with the opinion in Bonger v. American Water Works, 789 F.Supp. 1102 (D.Colo.1992), which concluded "[t]here are many situations * * * in which an employer would not discharge an employee if it subsequently discovered resume fraud, although the employee would not have been hired absent that resume fraud. In such situations, the employee indeed would suffer injury if discharged because of discrimination." Id. at 1106. Whether the employee would have been hired may be a factor in an employer's decision whether to fire an employee, and should not necessarily be disregarded. Id
 If a plaintiff claims he was not hired because of his race, then the appropriate Summers issue would be whether the plaintiff would have been hired in light of the after-acquired evidence. See East Texas Motor Freight System, Inc. v. Rodriguez, 431 U.S. 395, 403 n. 9, 97 S.Ct. 1891, 1897 n. 9, 52 L.Ed.2d 453 (1977) ("Even assuming, arguendo, that the company's failure even to consider the applications was discriminatory, the company was entitled to prove at trial that the respondents had not been injured and would not have been hired in any event."); Carroll v. City of Chicago, No. 87 C 8995, 1990 WL 37631, 1990 U.S. Dist. LEXIS 3186 (N.D.Ill. March 20, 1990) (alleged discrimination was at hiring stage, and therefore the court properly focused on whether the applicant would not have been hired if no discrimination had occurred). Generalizing, the hypothetical inquiry should correspond to the time of the allegedly discriminatory employment decision.
 
 
 [6]
 This formulation of the issue assumes that the Summers rationale survives the changes implemented in Section 107 of the Civil Rights Act of 1991, a question we do not consider
 
 
 [7]
 We do agree with Washington that the language in Washington's application that he "may" be terminated for any misrepresentations is not dispositive. Proving "that the same decision would have been justified is not the same as proving that the same decision would have been made." Price Waterhouse, 490 U.S. at 252, 109 S.Ct. at 1791 (citations omitted)