Ronald NABORS, Plaintiff,

v.

MARYLAND–NATIONAL CAPITAL PARK & PLANNING COMMISSION, Defendant.

Civ. A. No. PJM 91–1546.

United States District Court, D. Maryland.

Aug. 31, 1994.

Ronald Nabors, pro se.

Steven M. Gilbert, County Attorney's Office, Rockville, MD, for defendant.

## OPINION

MESSITTE, District Judge.

I.

Plaintiff Ronald Nabors says Defendant Maryland National Capital Park and Planning Commission (MNCPPC) violated Title VII of the Civil Rights Act of 1964 as amended, when it discharged him from employment in July, 1990. Defendant denies that its decision was in any way racially motivated, citing Plaintiff's poor performance and false statements on his employment application as justification for its decision.

The Court, in a bench trial lasting 4 days, heard from several witnesses and received a number of exhibits.

The Court concludes that Plaintiff has not carried his burden of proving, either prima facie or ultimately, that his discharge was racially based. The Court finds that Defendant acted upon two equally valid nondiscriminatory reasons when it determined to end Plaintiff's employment.

II.

In the Spring of 1989, Plaintiff, an African American male then 47 years of age, applied for the job of Horticultural Supervisor II with Defendant, the bi-county agency responsible for public parks in the National Capital

area. Among the advertised requirements for the job was the holding of a bachelor of science degree in horticulture plus 4 years experience or, alternatively, an equivalent combination of education and experience.

On his application, Plaintiff indicated that he held a bachelor of science degree in ornamental horticulture from Michigan State University (MSU). He also detailed his work experience in the field. Of 13 eligible candidates for the position, Plaintiff was rated "best qualified" and, on July 27, 1989, he was offered the position at an annual salary of $34,000. The offer specified a probationary period of from 6 to 12 months. Plaintiff was also asked to furnish his college transcript upon entering employment and to pursue, as a condition of his employment, a pesticide license, which it was understood he did not at the time possess. Plaintiff commenced work on August 7, 1989, and was placed in charge of the landscape and maintenance crew for the Northern Area of Prince George's County, a position in the Maintenance and Development Division of the Commission's Department of Parks and Recreation.

Over the first 6 months of his employment, Plaintiff apparently performed well. His formal evaluation at the end of that period, *i.e.* as of February 7, 1990, rated him "very good" in 18 of 21 categories and "good" in the remaining 3. His immediate supervisor, however, indicated in the evaluation that Plaintiff had not yet obtained his pesticide license and should therefore be continued on probation for another 6 months, implicitly suggesting that Plaintiff should obtain his license during that period. The record reveals no complaints about the quality of Plaintiff's work to that point, nor is there any indication that racial incidents of any sort occurred. Plaintiff, for his part, appears to have made no complaint of any such incident.

Beginning in early March, 1990, things took a decided turn for the worse. The precipitating event was a disagreement Plaintiff had over the time card of one of his subordinates, Wayne Brookman. Brookman's time card for March 2, 1990 had not apparently been punched out, nor had Brookman signed it. Plaintiff, questioning whether Brookman had in fact worked the hours shown, declined to sign the card. When Plaintiff's superior, A.J. Simons, heard of this, he confronted Plaintiff and told him to "sign the damn card." Plaintiff took this as an improper directive as well as an act of interference with his role as Brookman's supervisor.

On March 9, Plaintiff and Brookman had a face-to-face clash at the Fairland Regional Park, where Plaintiff was supervising a project. According to Brookman, Plaintiff was "coming down hard" on him, for reasons Brookman says he did not understand, in light of their previously cordial relationship. Brookman also took the occasion, however, to criticize Plaintiff's professional competence, including his planting of cypress trees in the swale around the tennis courts, which Brookman said should have been left open for drainage purposes. In the midst of the clash, Brookman telephoned or radioed Plaintiff's supervisor, Simons, to complain about Plaintiff and, with curious dispatch, Simons arrived on the scene.

Simons then began to berate Plaintiff himself. He criticized the planting of the cypress trees in the swale, as well as the excessive use of peat moss and other planting deficiencies. According to Plaintiff, Simons also said "you people are famous for saying you know how to do things when you don't," which Plaintiff took to be a racial slur. While Simons denies making that or any other racist remark, he admits that the exchange with Plaintiff was heated.

Two days later, Simons, purportedly skeptical of Plaintiff's professional training, inquired of the personnel office at the Commission as to Plaintiff's college transcript. To his surprise, he learned that no such transcript could be found in Plaintiff's file, despite the fact that the letter offering Plaintiff employment in July 1989 had requested that Plaintiff supply a transcript upon entering employment. Simons then sent Plaintiff a memo requesting that he supply the transcript and verify that he in fact held a bachelor of science degree from MSU.

Plaintiff, meanwhile, remained under scrutiny for the Fairland project. In early April,

1990, Gregory Kernan had joined the Commission as an assistant to Simons, with immediate supervisory responsibility over Plaintiff. Kernan, an African American, had occasion to visit the Fairland site and judge for himself the quality of Plaintiff's work. He, too, found the workmanship deficient and called the matter to Plaintiff's attention. Another visitor to the project was Larry Quarrick, a white landscape architect who had drawn the designs for the plantings at Fairland. Quarrick joined the chorus of Plaintiff's critics: At trial, he testified that Plaintiff's crew had planted approximately 10 Leyland cypress trees in the drainage swale alongside the tennis court where they did not belong; that the other trees were planted too high and were overmulched for drainage purposes; and that a curb above the swale had been broken by Plaintiff's crew, causing excess water to flow into the swale. In Quarrick's expert opinion, Plaintiff's work at Fairland was "considerably" inferior.

Plaintiff responded to these criticisms by sending a series of memos to Simons and other Commission officials, laying out his own grievances. These included his concern over Brookman's time cards, Brookman's insubordination, and Simons' apparent encouragement of Brookman's insubordination, as well as a defense of his professional efforts at Fairland. Plaintiff questioned why he had been asked, as no other Commission employee before him had been, to supply a college transcript. Apart from his apparent reference to Simons' remark about "you people," however, Plaintiff made no complaint of racial episodes or discrimination.

In late April, 1990, Plaintiff's various complaints came to the attention of Leroy Hedgepeth, employee relations specialist at the Commission. Hedgepeth undertook a factfinding inquiry in which he consulted Plaintiff, as well as Simons and Steele. Hedgepeth concluded that in fact there was a valid question about the propriety of Brookman's time card and that Plaintiff had not acted unreasonably in refusing to sign the card.

According to Hedgepeth, there appeared to be a good possibility that Brookman was claiming and getting approval for time which he might not in fact have worked.[1] Hedgepeth also found that Brookman had acted inappropriately in trying to circumvent Plaintiff when he contacted Simons and that Simons had acted inappropriately in encouraging Brookman to do so. Hedgepeth, himself an African American, made no finding with regard to Simons' alleged racial statement and, while acknowledging Plaintiff's experience as a horticulturist, also declined, because of his own limited technical expertise, to judge Plaintiff's professional work.

Hedgepeth expressly questioned, as Associate Director of Parks and Recreation Richard Stevenson also questioned, why Plaintiff had been singled out to provide his college transcript. But Hedgepeth acknowledged a disconcerting revelation that had come to him from Michigan State University. In response to the process begun by Simons, MSU had sent a transcript to the Commission which indicated that, while Plaintiff had attended the University for 3 years, he had in fact been dismissed for academic reasons in his final year without, of course, receiving a degree. Hedgepeth concluded that Plaintiff had falsified his application for employment at the Commission in 1989.

In the ensuing days, Plaintiff's competency continued to give Kernan cause for concern. Among other things, Kernan faulted Plaintiff for the late planting of spring annuals at various locations. The cumulative effect of this was that, by May 23, Kernan was recommending to his superiors that Plaintiff be fired.

Plaintiff vigorously sought to forestall the action, insisting that there must have been a mistake in regard to the college degree. At one point he suggested that, while he might not have received a degree, the only reason for that was because he owed MSU money and the school would not award degrees in such circumstances. Plaintiff asked Kernan

---

1. At trial, Commission officials claimed—not very persuasively, it might be noted—an inability to recall Plaintiff's complaints about Brookman's time cards. This is not, however, the forum to pass upon the propriety of Brookman's time cards and whether he was being inappropriately compensated. The only relevance of the time cards for present purposes is whether they tie into racial discrimination against Plaintiff.

for 30–45 days leave to travel to MSU in East Lansing, Michigan, to clarify the matter, but Kernan refused. When Plaintiff proposed to travel to the university on his own, Kernan indicated that he would not fire Plaintiff while he was away, but held out no promise that the trip might result in a change of the Commission's decision to discharge Plaintiff. And in fact it did not.

On June 19, pursuant to the merit system regulations of the Commission, Kernan notified Plaintiff that he intended to give him an unsatisfactory performance evaluation and to recommend his firing. On June 28, Hugh B. Roby, Director of the Commission's Parks and Recreation Division, gave Plaintiff 10 days' advance notice of his intent to discharge him and on July 13, 1990, the discharge became effective.

Plaintiff, in the meantime, traveled to MSU and, while accepting the fact that he had not graduated from the University, succeeded in getting the University to change his dismissal from an academic to a voluntary withdrawal. Without disclosing how he had accomplished this, Plaintiff again attempted to persuade Director Roby that the earlier transcript had been "in error."[2]

But Defendant's decision to fire Plaintiff stood. The official reasons given for his dismissal were wilful carelessness and negligence and falsification of his employment application.

The record shows that, while at the Commission, apart from Simons' alleged remark, Plaintiff never complained of racial discrimination in his employment. In addition, in their testimony, all Commission officials, including two African Americans, expressly denied that race played any part in Plaintiff's discharge. But almost simultaneously with his discharge, Plaintiff filed a complaint with the Equal Employment Opportunity Commission, alleging that his discharge had been racially motivated. Moreover, throughout this trial, Plaintiff has contended that the charges of professional incompetence against him were untrue; that they flowed primarily from Simons' desire to get rid of him; and that Simons' actions were motivated partially by racial animus and partially by his anger over Plaintiff's whistleblowing with regard to Brookman's time cards. Plaintiff also argues that other Commission employees who, like him, lied about their educational experience on job applications, were not discharged from the Commission as he was, but were permitted to remain. In the course of this proceeding, Plaintiff has expanded his claim to allege that he was required to work in a racially hostile and abusive environment.

### III.

To prevail in a Title VII job discrimination case, Plaintiff must prove by a preponderance of the evidence that the adverse employment action against him was taken for racially discriminatory reasons. 42 U.S.C. §§ 2000e–2000e–17 (1988). The burden of production then shifts to Defendant to demonstrate a legitimate non-discriminatory reason for the action. *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir.1993). If Plaintiff's claim is to survive, he must then prove by a preponderance of the evidence that the employer's reason was both a pretext and, ultimately, that the action was racially motivated. *Id.*

Plaintiff's prima facie showing may consist of direct evidence of racial animus or he may proceed by the *McDonnell Douglas* calculus, *i.e.* he may show that (1) he was a member of a protected class; (2) that he was performing up to the employer's expectations at the time of the adverse employment action; (3) that adverse employment action was taken against him; and (4) that other similar-

---

**2.** At trial, Plaintiff, who had very precise recall about many earlier facts in this case, claimed an inability to remember exactly how he got MSU officials to change their mind about his transcript. Plaintiff's deposition testimony on the point, however, while quite detailed, was seriously impeached by MSU officials. The Dean of MSU School of Horticulture, for instance, who testified at trial by way of deposition, indicated that his decision to change Plaintiff's transcript was based at least in part on Plaintiff's representation that he wished to re-enroll at MSU and complete his course work for the degree.

MSU's Registrar, in her deposition, also refuted Plaintiff's suggestion that a student would be refused a degree because he owed money to the school or that that in fact was what had happened in Plaintiff's case.

ly situated individuals, not members of the protected class, were treated more favorably than he.

### IV.

■ A) Plaintiff has demonstrated nothing approaching a racially hostile and abusive environment and nothing which shows that he in particular was in any sense a victim of racial discrimination. The only evidence he cites is Simons' alleged remark about "you people," which Plaintiff says drove all the unjustified criticism about the quality of his work. But, assuming Simons made the remark and acknowledging Plaintiff's earlier positive performance evaluation, other objective observers (including one African American, Gregory Kernan) have attested to the inferior quality of Plaintiff's performance in the Spring of 1990.

Moreover, in no sense was Plaintiff treated unfairly with regard to having to obtain his pesticide license within 6 months or having his probation extended. One of the express conditions of his engagement was that he obtain the license within the indicated time and two other Horticultural Supervisor II specialists at the Commission in fact acted within six months of their employment to get theirs. To the extent that other employees may not have been required to get their license within a 6 month period before obtaining career status, a pesticide license was less important to their successful functioning on the job. More significantly, no racial overtones characterized the requirement that Plaintiff obtain a pesticide license; indeed, in an effort to show that certain employees were not required to obtain the license, Plaintiff pointed to Basil Collins, a black man

from Jamaica, as an example, hardly proof of racial discrimination.

All other terms and conditions of Plaintiff's employment were scrupulously observed. He was, for example, given proper notification of his prospective unfavorable evaluation and he was given due notice of the Commission's intent to discharge him.

B) But Plaintiff contends that he was fired for lying on his resume, while others who did the same were permitted to stay.[3] The Court is no more persuaded by this argument than by the last.

The full sweep of Plaintiff's misrepresentation must be considered. He applied for a position, the first condition of which was the holding of a bachelor of science degree plus work experience. Even if equivalent experience and education were acceptable as a substitute, Plaintiff in fact chose to represent on his application that he held a bachelor of science degree in horticulture. He certified that his answers were true and correct and did so subject to the express understanding that a misrepresentation would constitute a grounds for dismissal. He repeated his deception about the college degree on at least two applications for promotion within the Commission as well as on his application for the pesticide license. Even when his lack of a degree was irrefutable, Plaintiff attempted to tell commission officials that the transcript showing him terminated for academic reasons was erroneous, saying nothing about how he had gotten MSU to change the transcript.

Plaintiff compares himself, with this background, to a white employee who misstated his educational experience and was permitted

---

**3.** Plaintiff expends considerable effort arguing that Defendant's decision to fire him for resume fraud was based upon after-acquired evidence; *i.e.* purportedly such fraud was not the actual reason he was let go, but merely an after-thought manufactured after the fact. *Compare Mardell v. Harleysville Life Insurance Co.*, 31 F.3d 1221 (3d Cir.1994) (after-acquired evidence of resume fraud is irrelevant at liability stage of Title VII/ ADEA case) *with Summers v. State Farm Mutual Automobile Insurance Company*, 864 F.2d 700 (10th Cir.1988) (after-acquired evidence of employee misconduct could be considered in discrimination suit if employer would have fired the employee for such conduct); *see also Reed v.*

*Amax Coal Company*, 971 F.2d 1295 (7th Cir. 1992) (resume fraud will not justify firing if employer does not prove it would have fired employee for that reason). But Plaintiff's arguments, quite simply, do not fit the facts. The deception on Plaintiff's employment application was known about *before* he was fired and was one of the reasons actually given for his firing. The fact that defense counsel, a few years after the firing, was able to develop testimonial inconsistencies regarding Plaintiff's efforts to have his college transcript changed bears upon whether Plaintiff should be believed today, not on how much Defendant may have known about his deception 4 years ago.

to remain on the job. That employee had represented that he held a master's degree in a certain field when in fact he did not. The evidence showed, however, that the white employee was fully enrolled in a master's program at the time he made the statement and had actually done all the required course work, lacking only the requisite thesis. He immediately admitted his error and was prepared to pay the consequences. Unlike Plaintiff, however, the white employee's supervisors found his work to be quite good and, while denying him the promotion that he almost certainly would otherwise have been granted, recommended that he be retained in probationary status. In short, the white employee and Plaintiff were not similarly situated with regard to their misstatements.

More significantly, Plaintiff's second example of an employee committing resume fraud but being permitted to stay on demonstrates rather forcefully why Plaintiff is not entitled to recover in this suit in this court. According to the Commission's personnel director, the other employee who was permitted to stay was an African American; thus, however differently Plaintiff may have been treated from others who committed resume fraud, it was clearly not for racial reasons.

The testimony of all Commission officials, especially that of Gregory Kernan and Leroy Hedgepeth, both African Americans, is ultimately what carries the day. There was no racial aspect to Plaintiff's employment at the MNCPPC, Defendant had legitimate non-discriminatory reasons for dismissing him, and there is not the slightest suggestion that it acted on pretext.

On the basis of the foregoing, the Court finds for Defendant and against Plaintiff.