John F. PUHY

v.

DELTA AIR LINES, INC.

No. 1:91–CV–1630–RCF.

United States District Court,
N.D. Georgia,
Atlanta Division.

Sept. 30, 1993.

Richard M. Maddow, Office of Richard M. Maddow, Atlanta, GA, for plaintiff.

William Henry Boice, Kilpatrick & Cody, Atlanta, GA, for defendant.

## ORDER

RICHARD C. FREEMAN, Senior District Judge.

This action is before the court on defendant Delta Air Lines, Inc. [Delta]'s motion for summary judgment [# 24–1] and plaintiff John F. Puhy [Puhy]'s cross-motion for summary judgment [# 29–1].[1] In conjunction with these motions, Delta has offered the affidavits of William C. Norman [Norman] and Carl Christian Hoffman [Hoffman], to which Puhy has objected [# 40–1]. Both summary judgment motions, as well as the objections to the affidavits, are strenuously opposed.

*Background*

This is an age discrimination case pursuant to the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* Because the timing of events plays a crucial role in this action, the court will identify the important and relevant dates. Puhy was born on June 3, 1948. Puhy applied for the positions of pilot and flight engineer with Delta on May 9, 1989, (when he was 40), and on April 17, 1990 (when he was 41). Delta denied him employment each time on the basis of his application, refusing to grant him an interview. On August 7, 1990, Puhy filed a discrimination charge with the Equal Employment Opportunity Commission alleging that age discrimination influenced Delta's decisions to reject his applications. After exhausting his administrative remedies, Puhy filed this action against Delta on July 15, 1991.

During the course of this litigation, both parties explored settlement options. On or about May 16, 1992, Delta and Puhy agreed that, without admitting liability and without necessarily terminating all claims, Delta would "process Puhy's application for employment in accordance with Delta's standard, ordinary and customary employee screening, hiring and placement procedures ... for a pilot's position with Delta." Plaintiff's Memorandum in Opposition to Defendant's Motion for Summary Judgment [Plaintiff's Response], Exhibit 2 [Agreement], at ¶ 1(a). The Agreement contemplated that if Puhy received a positive hire recommendation after undergoing the standard hiring procedures, Delta would hire Puhy and Puhy would terminate this action.

On May 18, 1992, Delta Senior Personnel Representative Henry Harrell [Harrell] interviewed Puhy pursuant to the Agreement. Apparently on the same day, Puhy was also interviewed and given a battery of standardized tests by Delta's industrial psychologists, Janus & Associates [Janus]. The tests administered by Janus, and required by Delta, are designed to measure the taker's conceptual, mechanical, and spatial aptitude. Based upon Puhy's performance on the tests,[2] Jan-

---

1. Delta argues that Puhy's cross-motion for summary judgment is untimely and should be stricken. Puhy concedes that the cross-motion comes out of time. However, he maintains that, under LR 220–5(c), NDGa., cross-motions for summary judgment are not subject to the same time limits as are "regular" motions for summary judgment. Puhy further claims that the court can "enter judgment for Plaintiff even in the absence of a motion." Plaintiff's Reply to Defendant's Response Brief at 1 n. 1.

The court finds these arguments highly unpersuasive. It should be patently obvious to plaintiff's counsel that a "cross-motion" for summary judgment is *still* a motion for summary judgment under the Local Rules. The goal of the Local Rules is the establishment of an efficient system governed by clear and ascertainable guidelines and time specifications. This goal would hardly be advanced if a significant portion of the motions filed in this or any other court—cross motions—were "exempted" from Local Rule coverage.

Nonetheless, the court retains the discretion to waive a local rule requirement and, in the interests of justice and efficient disposition, will consider the motion.

2. Puhy was given seven separate tests: The Minnesota Multi–Phasic Personality Test, the Shipley Institute for Living Test [the Shipley], the

us recommended to Delta that Puhy not be hired. Harrell believed that this recommendation concurred with his interview impressions of Puhy, and recommended that Delta not hire Puhy. Thus, this litigation continued, with Delta and Puhy cross-moving for summary judgment.

*Issues for Decision*

The court notes at the outset that this case is made exceedingly more complex by the undisputed facts arising after Delta's initial refusals to interview Puhy. The undisputed facts regarding Puhy's interviews, Janus's testing, and the negative recommendation of Puhy's candidacy from both Janus and Harrell require this court to initially determine: (1) whether to consider the evidence, and, if so, (2) to what extent and for what purpose the evidence may be used. If the evidence must be disregarded as irrelevant to the question of whether Puhy was illegally denied an initial screening interview, then the scope of the evidentiary review would be enormously narrowed. However, if the after-acquired testing/interview evidence is found relevant, its admissibility will hinge upon (1) unclear Eleventh Circuit precedent regarding the use of such after-acquired evidence, and (2) the court's construction of the Agreement governing the subsequent use of the evidence. Once these hurdles are surmounted, the court must then determine whether the record and the evidence considered discloses the existence of a genuine issue of material fact precluding the entry of summary judgment in either party's favor.

After careful review of this complex situation, the court finds that: (1) the after-acquired evidence may be used by the parties, (2) use of the after-acquired evidence is limited to what the Agreement defines as "objective," and (3) genuine issues of material fact preclude summary judgment for either side.

*Discussion*

### A. Summary Judgment Standard

Under Fed.R.Civ.P. 56 the court should grant a motion for summary judgment where "there is no genuine issue as to any material fact and ... the moving party is entitled to

judgment as a matter of law." The movant carries his burden by showing the court that there is "an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). As the Eleventh Circuit has explained, "[o]nly when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). The nonmovant is then required "to go beyond the pleadings" and present competent evidence in the form of affidavits, depositions, admissions and the like, designating "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 334, 106 S.Ct. at 2553. Generally, "[t]he mere existence of a scintilla of evidence" supporting the nonmovant's case is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The court, resolving all reasonable doubts in favor of the nonmovant, must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *Id.*

### B. Discrimination Standards

■ There are two ways to prove discrimination: (1) through direct evidence, and (2) through indirect, circumstantial evidence. *Lee v. Russell City Bd. of Educ.*, 684 F.2d 769, 773–74 (11th Cir.1982). As the Eleventh Circuit has explained:

> Evidence is direct when it is sufficient to prove discrimination without inference or presumption. Only the most blatant remarks whose intent could be nothing other than to discriminate constitute direct evidence. In the face of direct evidence, the defendant must prove that the same employment decision would have been made absent discriminatory intent.

*Coats v. Coats and Clark, Inc.*, 990 F.2d 1217, 1223 (11th Cir.1993) (citing *Carter v.*

---

Wesman verbal and math tests, and mechanical, spatial, and abstract Differential Aptitude Tests.

Delta makes no claim that Puhy fared poorly on any test except the Shipley.

*City of Miami,* 870 F.2d 578, 581–82 (11th Cir.1989)) (citations omitted).

■■■ In order to prove discrimination by circumstantial evidence, a plaintiff such as Puhy must show that: (1) he belongs to a protected class (in this case, applicants over 40); (2) that he applied and was qualified for a job for which the employer was seeking applicants; (3) that he was rejected despite his qualifications; and (4) after his rejection the job remained open and the employer continued to seek applicants with similar qualifications. *Earley v. Champion International Corp.,* 907 F.2d 1077, 1082 (11th Cir. 1990). If Puhy makes that showing, then Delta must come forward with a legitimate, non-discriminatory reason for not hiring Puhy. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). If Delta makes a satisfactory showing in this regard, then the burden shifts back to Puhy to establish that the proffered non-discriminatory reason is a mere pretext for discrimination. *Id.,* at 255, 101 S.Ct. at 1095.

## C. Discrimination at the Application Stage

The major dispute in this case involves the information garnered about Puhy pursuant to the Agreement after this suit had been filed based upon Delta's two refusals to grant Puhy an interview. However, the court must first determine whether Delta is entitled to summary judgment based upon its explanation for its refusal to grant initial interviews to Puhy in 1989 and 1990. On this point, Delta offers the challenged affidavit of Delta Personnel Representative William C. Norman (who made the decision not to hire Puhy based solely on his applications), for the purpose of showing that there was a legitimate, nondiscriminatory reason for not granting Puhy initial interviews. Norman gives three reasons why Puhy was not asked to interview: (1) Puhy's association with Eastern Air Lines made Norman suspect that Puhy would bring with him a confrontational attitude reportedly prevalent at Eastern, Norman Aff. ¶ 6(a); (2) Puhy has insufficient

flight time to be competitive with other applicants, particularly those with military and heavy aircraft experience, *id.* at ¶ 6(b); and (3) Puhy failed to follow directions in completing his application with Delta, *id.* at ¶ 6(c).

■■■ Puhy challenges the affidavit of Norman on two grounds. First, Puhy argues that Delta failed to identify Norman during discovery when Puhy requested information about anyone who had any dealings with Puhy's candidacy. *See* Plaintiff's Objections at 1–2. The court does not accept this argument. As Delta points out, independent of his discovery requests, Puhy knew through deposition testimony that Norman existed, and even had knowledge of Norman's position and function in the hiring process. See Defendant's Response to Plaintiff's Objections at 2–3 (citing Plaintiff's Reply to Defendant's Memorandum in Support of Summary Judgment at 2–3).[3] Thus, Puhy's claim that he was prejudiced by Delta's alleged failure to honestly answer discovery requests borders is difficult to believe. Even if Puhy did not know that Norman was the actual application decisionmaker, Puhy did know that Norman was one of a *very small* number of people who could have made the decision. *See* Plaintiff's Reply to Defendant's Memorandum in Support of Summary Judgment at 2 (stating that Norman or Art Davis made the decisions on the applications). If Puhy's counsel did not know whether Davis or Norman made the specific decision in Puhy's case, it is apparently because Puhy's counsel never asked.

■■■ Second, Puhy claims that the Norman affidavit is unreliable because the testimony therein conflicts with other evidence in the record. For example, Puhy challenges Norman's assertion that Puhy was not qualified because he lacked military and quality flight experience by citing two applicants that Norman recommended to his superiors who also did not possess military experience and whose flight experience was similar to Puhy's. Plaintiff's Objections at 8–9. Both applicants were younger than Puhy. Fur-

---

**3.** The parties also submit conflicting affidavits of their respective counsel regarding whether infor-    mation about Norman was actually supplied by Delta independent of the discovery requests.

thermore, Puhy points out that Norman admittedly provides affidavit testimony after his recent, *second* review of the application he rejected nearly three years prior in 1990, and after he was made aware of the Puhy litigation. *Id.* at 7.

The Norman affidavit will not be stricken.[4] However, in light of Puhy's response, this court finds that the veracity, credibility, and probative value of the Norman affidavit is disputed, indicating the presence of a fact question on the discrimination-at-application issue. Delta cannot gain summary judgment based upon Norman's affidavit alone. Thus, the court must consider other evidence to rule upon these motions.

### D. After–Acquired Evidence: The Eleventh Circuit Stance

█ The so-called "after-acquired evidence doctrine" concerns the use of evidence acquired (usually) by an employer, after its decision, which tends to show that the defendant "would not have hired" or "would have fired" the plaintiff regardless of the alleged discriminatory motive. The circuit courts have not spoken with one voice on the use of such evidence. Instead, opinions diverge on whether after-acquired evidence may completely negate a claim, is confined to the remedies inquiry, or may be considered only in the special circumstance of job-application prevarication.[5] The Eleventh Circuit spoke recently on the use of after-acquired evidence in *Wallace v. Dunn Construction Co.,* 968 F.2d 1174 (11th Cir.1992), holding that such evidence should *not* be applied so as to totally preclude recovery for past discrimination. Rather, the *Wallace* panel held that after-acquired evidence is only relevant to the available remedies. The *Wallace* panel's holding, however, appears to be limited to cases involving discriminatory discharge, not wrongful refusal to hire. After careful consideration, the court concludes that *Wallace* is inapplicable to this case.

In *Wallace,* the Eleventh Circuit declined to follow the Tenth Circuit's decision in *Sum-*

*mers v. State Farm Mutual Automobile Ins. Co.,* 864 F.2d 700 (10th Cir.1988). In both *Summers* and *Wallace,* the plaintiffs were fired for allegedly discriminatory reasons. Discovery in both *Summers* and *Wallace* revealed that the plaintiffs had committed acts that, if known or relied upon at the time of the firing, would have provided a legitimate basis for dismissal. In light of this "after-acquired evidence," the *Summers* court held that the plaintiff suffered no legal injury because the plaintiff could have been fired anyway. The *Wallace* panel, however, rejected the *Summers* court's reasoning. The *Wallace* majority declared that, regardless of subsequent justification discovered to defend an employment discrimination, the purpose of antidiscrimination legislation was " ' "to achieve equality of employment opportunity" ' " by giving employers incentives ' "to self-examine and self-evaluate their employment practices and to endeavor to eliminate, so far as possible" ' employment discrimination," *Wallace,* 968 F.2d at 1180 (quoting *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 417–18, 95 S.Ct. 2362, 2371–72, 45 L.Ed.2d 280 (1975)) (quoting *Griggs v. Duke Power Co.,* 401 U.S. 424, 429–30, 91 S.Ct. 849, 852–53, 28 L.Ed.2d 158 (1971)).

However, the *Wallace* court also explicitly declined to hold that such after-acquired evidence is *never* relevant to the defendant's actions. Instead, the court ruled that such evidence is only relevant to the relief due a successful plaintiff. See *Wallace,* 968 F.2d at 1181. Specifically, the court held that after-acquired evidence could bar prospective remedies such as injunctions and front pay, but could *not* affect back pay and other remedies necessary to make the plaintiff whole. *Id.* at 1182–84. The court reached this conclusion mindful of the "boundary [that must be drawn] between the preservation of the employer's lawful prerogatives and the restoration of the discrimination victim." *Id.* at 1181.

---

**4.** The court agrees with Delta that Puhy's objections to the Hoffman affidavit require no response.

**5.** *See generally Massey v. Trump's Castle Hotel and Casino,* 828 F.Supp. 314 (D.N.J.1993) (discussing in detail the varied approaches in the circuit courts to after-acquired evidence).

The ultimate holding of *Wallace* does not compel this court to disregard the proffered after-acquired evidence in this case.[6] In applying the reasoning of *Wallace* to the case *sub judice*, it must be remembered that *Wallace* was predicated on a "wrongful discharge" fact-pattern. This context informed much of the court's reasoning. Of paramount and dominant concern in the *Wallace* opinion was preventing the use of the after-acquired evidence to "place[ ] plaintiff in a worse position than if he had not been a member of the protected class." *Wallace*, 968 F.2d at 1179. In wrongful discharge cases, if the discrimination had not occurred, then the plaintiff would have still possessed the job. Allowing subsequent evidence to negate the otherwise cognizable injury would establish that the *status quo ante* was joblessness, not employment, thus placing the plaintiff in a worse position at law.

In contrast, however, the *status quo ante* for Puhy is joblessness. The after-acquired evidence could support Delta's contention that even if the alleged discrimination had not occurred and Puhy had initially been granted an interview and testing opportunity, Puhy would not have been hired anyway. Thus, the *status quo post* would still be joblessness. At most, using the after-acquired evidence would put Puhy in no worse a position than if he had not belonged to the protected age category.[7] Thus, if Delta's after-acquired evidence is to be believed, "no injury to [Puhy could be] possible because, in fact, [he] never would have been hired absent the discriminatory motive." *Wallace*, 968 F.2d at 1179 n. 8.

### E. After–Acquired Evidence: The Parties' Voluntary Limits

Therefore, the *Wallace* decision imposes no bar on the use of the after-acquired evidence in this case. This finding alone, however, does not end the court's inquiry. While the law imposes no legal bar to the use of the evidence, the parties' Agreement voluntarily limits the scope of evidence admissible in this action. Paragraph 1(d) of the Agreement states in pertinent part:

> In the event Puhy is not recommended for employment for *subjective* reasons, the parties hereto agree that such denial and all matters which relate in any way to this settlement agreement, and any and all aspects of the employment assessment procedure utilized pursuant thereto, will not be used, in any way or in any manner, at any subsequent trial, hearing, or adjudicatory proceeding.

Agreement ¶ 1(d). The parties defined "subjective" as "any reason or basis which is discretionary according to the judgment and will of others, and includes such reasons or bases as, but is not limited to, the opinions or beliefs of the interviewers." *Id.*

A parallel provision of the Agreement provides that "[i]n the event Puhy is not recommended for employment and is denied employment for objective reasons, Delta specifically reserves the right to introduce any facts of such denial as evidence in any subsequent trial, hearing or adjudicatory proceeding." Agreement ¶ 1(e). The parties defined "objective" as "any reason or basis which is quantifiable or subject to verification, and includes such reasons or bases as failure of any medical, psychological or other objective tests." *Id.*

Neither party has chosen to make the Agreement a significant battleground in this case. Nonetheless, the court must determine from the Agreement which portions of the 1992 interview/testing evidence may be con-

---

6. Cf. *Wallace*, 968 F.2d at 1181 ("To be sure, the boundary will vary depending on the facts of each case. Therefore, the effect of after-acquired evidence on Title VII remedies is best decided on a case-by-case basis.").

7. Though the Eleventh Circuit did not so indicate, the foregoing reasoning may explain why decisions such as *Smallwood v. United Air Lines, Inc.*, 728 F.2d 614 (4th Cir.), *cert. denied*, 469 U.S. 832, 105 S.Ct. 120, 83 L.Ed.2d 62 (1984), are distinguishable from the *Summers* and *Wallace* situations. *Smallwood* was a refusal-to-hire decision not unlike the present case; the Eleventh Circuit disregarded it and faulted the Tenth Circuit for its reliance upon it in *Summers*. See *Wallace*, 968 F.2d at 1178–79 n. 8. The factual similarity of *Smallwood* coupled with the Eleventh Circuit's refusal to consider *Smallwood* supports the court's decision to distinguish *Wallace* in this case.

sidered in ruling on these motions or at trial.[8] The court finds that the Agreement compels exclusion of the "subjective" impressions formed by interviewers at both Janus and Delta. The court therefore disregards the portions of the Janus evidence referring to Puhy as "unfriendly" with "weak interview impact" and a penchant for "problematic office behavior." *See* Puhy Response, Exhibit 5. Likewise, all testimony detailing the bases and background for such remarks will be ignored. On the other hand, the Agreement expressly contemplated and authorized the use of the psychological testing scores. *See* Agreement ¶ 1(e). Therefore, the tests administered by Janus and the conclusions[9] based upon them will be considered.

Harrell's averments based upon his interview with Puhy will be disregarded to the extent that they constitute conclusions about Puhy as opposed to identifiable and verifiable facts. Thus, Harrell's assessment of Puhy as "lack[ing] the loyalty and commitment sought in Delta employees," Harrell Aff. ¶ 8, is purely subjective, though it may be based upon "objective" facts. Similarly, Harrell's contention that Puhy was either "sloppy or dishonest" because the entries in his log books were "corrected," Harrell Aff. ¶ 8, also belies a subjective conclusion. Whether a few technical or superficial mistakes reflects sloppiness depends upon the standards used by the person exercising the judgment.[10]

However, even though Harrell's conclusion of "sloppiness" as a personal quality must be disregarded, the fact that Puhy made corrections in his log books and the fact that Delta apparently takes an objective, across-the-board dim view of applicants who fail to exercise care on their applications and the like, Harrell Aff. ¶ 5, will not be disregarded. If failure to dot "i"s and cross "t"s disqualifies one from Delta employment, regardless of factors particular to the individual, then Harrell's determination that Puhy's inattention to detail disqualified him from Delta employment came as an objective determination according to objective Delta criteria.

In sum, ruling upon the summary judgment motions at bar, the only after-acquired evidence the court will consider consists of: (1) the test results from Janus accompanied by the professional critiques, explanations, and the circumstances surrounding them; and (2) the objective basis for Harrell's "do not hire" recommendation. The remainder of the proffered after-acquired evidence consisting of conclusions gleaned from interviews from Puhy will be disregarded.

### F. Puhy's Claims, Delta's Defenses

The central dispute in this case involves Delta's alleged basis for not hiring Puhy:[11] Puhy fared poorly on the Shipley. The legitimacy of this explanation is central to the summary judgment motions before the court on three levels: (1) As to Puhy's motion, if this ground qualifies as a "legitimate, nondiscriminatory reason" for not hiring Puhy, then

---

**8.** This inquiry is necessary because the court may only consider evidence in motions for summary judgment that would be admissible at trial. *See Property Management and Investments, Inc. v. Lewis*, 752 F.2d 599, 604 n. 4 (11th Cir.1985).

**9.** The conclusions will be considered for two reasons. First, the test scores and the ultimate "do not hire" decision would be meaningless unless the conclusions from the test are considered. Second, if the same conclusion would have been reached whether John Doe or Puhy had received the score, then the conclusion is not particular to Puhy, and is therefore "objective." If, on the other hand, the conclusion based upon Puhy's score is unusual or deviant from normal operating standards, then the conclusion would be a significant factor supporting Puhy's contention that the test was pretext for discrimination. However, the conclusion itself would not be subjective within the meaning of the Agreement. To

so hold would invalidate any professional interpretation of Puhy's psychological test scores, and would directly contradict the meaning of "objective" in the Agreement (which includes "failure of ... psychological tests").

**10.** Indeed, this court has noted more than a few typographical errors in the parties' otherwise sterling submissions, yet would not counsels' performance "sloppy."

**11.** It is true that Delta did not rely exclusively on the Shipley in rejecting Puhy. However, because Delta maintains that the Shipley score alone could have disqualified Puhy, because Puhy does not directly challenge the intermingling of rationales, and because the other "evidence" that might have influenced the decision not to hire Puhy must be excluded per the Agreement, the court will consider the test score as though it were the only reason proffered.

Puhy will have to conclusively show that Delta's reliance on Puhy's Shipley score is a mere pretext for discrimination in order to earn summary judgment based upon circumstantial evidence;[12] (2) as to Puhy's motion, if the explanation is offered in good faith (i.e., not pretext), then Delta could show that it "would not have hired" Puhy anyway, thus negating Puhy's direct evidence theory; and (3) Delta's motion for summary judgment depends upon a conclusive, undisputed showing of the predicates in the first two inquiries above. The court finds that neither party has demonstrated the absence of a genuine issue of material fact regarding either the Shipley test or the propriety of Delta's reliance upon it sufficient to entitle Puhy or Delta to summary judgment as a matter of law.

It is undisputed that Puhy took the tests administered by Janus, Puhy Aff. ¶ 10; that Puhy scored "very slow" on the Shipley, Harrell Aff. ¶ 9; that Delta's explanation for not hiring Puhy in 1992 was Puhy's "poor" performance on this allegedly critical test, *see*

*generally* Brief In Support of Defendant's Motion for Summary Judgment; and that the Shipley is a major criterion for Delta decisions.[13] *See* Harrell Aff. ¶¶ 10, 11, 14. In this case, it is the validity of the score itself that generates the issue to be tried.

It is undisputed that Puhy was given the Shipley in two installments. When the test is administered to pilots, according to Dr. Micah Janus of Janus and Associates, the abstraction portion should be given in only one installment lasting ten minutes. *See* Deposition of Dr. Micah Janus at 71. Evidently, after some *undetermined* length of time had elapsed during Puhy's testing, *see* Puhy Aff. ¶ 18; Defendant's Response at 3–5 (failing to establish that ten minutes were in fact given), the Shipley was taken from Puhy and a different test was administered. After the administration of the second test, the proctor gave the Shipley back to Puhy to work on for an additional five-minute period. Janus Dep. at 81–84. Because Puhy was applying for a pilot position,[14] only Puhy's first-installment performance was measured, which yielded a

**12.** Delta does argue, as its preferred defense, that Puhy was "not qualified" within the meaning of four-prong inquiry from *Earley*. The court finds this unpersuasive and, ultimately, unimportant for several reasons. First, Delta did publish minimum qualifications for the job. *See* Defendant's Responses to Plaintiff's Interrogatories No. 2, and No. 7. There is no allegation that Puhy failed to meet the minimum qualifications.

Second, Delta cites non-binding authority for the proposition that the standard by which a plaintiff's qualifications should be judged is the perception of the decisionmaker. *See, e.g., Rosengarten v. J.C. Penney Co.,* 605 F.Supp. 154, 157 (E.D.N.Y.1985). However, Puhy responds by pointing out that the Fifth Circuit has held that a plaintiff need not prove that he was the *most* qualified candidate, but only that his background was such that he was presumptively qualified. *See Wright v. Western Electric Co.,* 664 F.2d 959, 964 (5th Cir.1981). The court finds Delta's argument germane as to its discretion regarding how high to set its minimum thresholds (indeed whether to hire Puhy at all absent discriminatory intent), but does not agree that just because Puhy was not the top, or even a competitive, candidate he was not "qualified." In making this decision, the court is mindful that "[t]he burden of establishing a prima facie case of discriminatory treatment is not onerous." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981).

Finally, whether Puhy was "qualified" (beyond the minimum stated) in Delta's terms is largely immaterial to this action. The reason Delta maintains Puhy was not "qualified" is because Puhy fared poorly on the Shipley. However, Puhy's Shipley performance also serves as Delta's proffered legitimate, nondiscriminatory reason for not hiring him. Rather than collapse the two inquiries into one, the court believes the propriety of Delta's reliance on the Shipley is more appropriately examined in the context of the "legitimate, nondiscriminatory" analysis.

**13.** There is some dispute among the parties as to whether the Shipley should, as a matter of law, be a "legitimate" basis for the refusal to hire Puhy. Puhy's evidence shows that Delta has hired pilots who have scored below average on the Shipley. Plaintiff's Response at 6. Delta's evidence shows that there were countervailing factors in each of those cases, namely, a "hire" recommendation from Janus. *See id.;* Harrell Aff. at ¶ 11. At most, Puhy's evidence could be probative on whether the use of the Shipley in this case is mere pretext; it does not show as a matter of law, however, that Delta improperly relies upon it in general. Thus, Delta is not barred from raising the Shipley scores as a legitimate basis for its refusal to hire.

**14.** Dr. Janus also testified that the Shipley is sometimes given to applicants for non-pilot positions, and that that test is given in two installments.

score of "very slow." *See generally* Janus Dep. at 80–96 (explaining how Puhy's test was scored). Puhy's performance coupled with the second installment would have earned him an "average" score. *Id.* Puhy claims that this testing irregularity prejudiced him and caused him to receive a tainted score that Delta should not have used, and, most important, would not have used unless Delta was predisposed to deny him employment. Plaintiff's Response at 27–33.

Because neither party can show that the first installment of the test lasted the required ten minutes, the validity of the test score is in question.[15] The question upon which summary judgment for both sides now hinges is whether the testing irregularity, coupled with the other circumstances of the case, could permit a fair-minded jury to conclude that Delta's reliance upon the test was pretext for discrimination.[16] The court rules that a jury could so find.

In making this ruling, this court emphasizes that no finding of pretext has been made, and makes no comment or prediction upon whether such a finding will be made at trial. The court merely holds that the jury could find Puhy's testimony about the incident and the general atmosphere compelling and credible. The jury could find Dr. Janus' explanation for the mistake weak. The jury could find Puhy's comparative and statistical "direct evidence"[17] supportive of Puhy's claim of bad faith. However, the jury could also find that Delta relied on the test in good faith, with no knowledge of the irregularity.[18] The jury could also find that the first installment was in fact given in the requisite time

---

15. Delta argues that the test score is valid because Puhy presents no concrete evidence other than his own perceptions that the test was not administered for a full ten minutes in the first installment. See Defendant's Response at 3–5. Delta, however, does not establish in the alternative that the test *was* given in the required time. Delta's reliance on Dr. Janus' deposition establishes that Dr. Janus has formed an opinion as to why the second installment was administered, but *does not in any way* establish the validity of the first installment's time element. Unless Dr. Janus was the proctor, which he wasn't, resolution of this issue must wait until trial.

16. A showing that Delta's reliance on the test was mere pretext would surely be fatal to Delta's claim that it "would not have hired" Puhy anyway, as that analysis presumes the absence of discriminatory intent.

17. In support of his motion for summary judgment, Puhy's proffered direct evidence of discrimination consists of statistics, comparisons to other Delta applicants (who were older and younger, more or less qualified, and whether hired or not hired), and statements allegedly made by Delta employees designed to show discriminatory animus on the part of Delta. Delta challenges the validity of the statistics, the conclusions drawn therefrom, the comparisons drawn, and the significance and probative value of the alleged statements. For two reasons, the court finds that this evidence fails to entitle Puhy to judgment as a matter of law.

First, the statistics and other evidence are offered to show discriminatory intent. Discriminatory intent is a fact question. *Bell v. Birmingham Linen Service*, 715 F.2d 1552, 1557 (11th Cir.1983). Delta's entire defense and the facts in support thereof are designed to negate a finding of intent.

Second, a reasonable jury may or may not agree that the statistics mustered mean what Puhy maintains they mean. For example, Puhy points out that from January 1, 1989 to September 30, 1990, Delta received 5335 pilot applications (4005 of these from applicants younger than 40, 1330 from applicants older than 40). Of all 40–plus Delta applicants during the period, 3.75% were ultimately hired. Specifically, 23.31% (310) were granted interviews, and 16.12% (50) of interviewed applicants were hired. Of all Delta applicants under 40 in the same time period, 16.87% were ultimately hired. Specifically, 54.78% (2194) were granted interviews, and 30.8% (676) of interviewed applicants were hired. Though the younger applicants generally fared better, a fair-minded trier of fact could determine that the numbers do not indicate discrimination, especially when countervailing factors offered by Delta are added to the mix.

(The court is mindful of Delta's argument that Puhy's statistical conclusion is flawed because it assumes all applicants to be equally qualified. Without passing upon the merits of this contention, the court notes that, even assuming that the statistical sample and premises are sound, the percentages derived by Puhy, on their face, create the issue appropriate for a jury's judgment.)

18. Delta argues that it would be entitled to rely on the results even if the test scores were invalid, because it had no notice of the testing irregularities. *See* Defendant's Response at 5–6. Delta's point is well taken, but it goes to the issue of pretext. The critical issue is whether a jury could find that, given all the circumstances, Delta's reliance on the test result was pretext for discrimination. Delta's alleged good faith has not been proven and will not be presumed in face of argument and plausible inference to the contrary.

frame. Finally, the jury could also find that the "direct evidence" is insubstantial, or explainable, or both.

In sum, the court holds that because a reasonable jury could find that Delta relied upon the test in bad faith (in whatever form or nature), there lurks the possibility (however real or slight) that the test was administered for the purpose of "sandbagging" Puhy. *Cf. Wallace,* 968 F.2d at 1180–81. This would obviously carry Puhy's burden of proving pretext, and would negate Delta's affirmative defense to the direct discrimination charge that Delta would not have hired Puhy anyway absent the discriminatory motive. Summary judgment for Delta is therefore denied.

Similarly, the jury could find that Delta acted in good faith, thus establishing a legitimate, nondiscriminatory reason free from pretext in defense of Puhy's circumstantial evidence claim. This finding would also significantly assist Delta's affirmative defense that it wouldn't have hired Puhy anyway.

Thus, summary judgment for Puhy is also denied.

*Conclusion*

Accordingly, defendant Delta Air Lines, Inc.'s motion for summary judgment [# 24–1] is DENIED. Plaintiff John F. Puhy's cross-motion for summary judgment [# 29–1] is DENIED. Plaintiff's objections to the affidavits of William C. Norman and Carl Christian Hoffman [# 40–1] are OVERRULED. Pursuant to LR 235–4, NDGa., the parties are DIRECTED to file a Consolidated Pretrial Order within thirty (30) days from the entry of this order. In the event that the parties fail to comply with this order, the Clerk is DIRECTED to resubmit this action at the expiration of the above time period.

SO ORDERED.